[S. F. No. 15979. In Bank.—May 2, 1938.]

COUNTY OF LOS ANGELES, Petitioner, v. ROGER JESSUP, as Chairman of the Board of Supervisors of Los Angeles County, Respondent.

Everett W. Mattoon, County Counsel, J. H. O'Connor, Assistant County Counsel, S. V. O. Prichard and L. K. Vobayda, Deputies County Counsel, for Petitioner.

Gail J. Burck for Respondent.

WASTE, C. J.—The petitioner seeks by this proceeding in *mandamus* to compel the respondent, as chairman of its board of supervisors, to sign and execute certain releases of liens and mortgages acquired by petitioner upon the real properties of the recipients of financial aid granted under the provisions of the Old Age Security Act. Respondent has demurred.

It appears that the Old Age Security Act was originally enacted in 1929 (Stats. 1929, chap. 530, p. 914). Generally speaking, the statute provided for the granting of financial assistance to the needy aged who met the requirements of the act and whose property did not exceed in value a specified amount, as originally enacted, $3,000. A detailed statement of the requirements that had to be satisfied in order to make one eligible for the benefits available under the act is not indispensable to our present problem. As originally adopted, the statute declared that as a condition to the granting or continuance of aid the board of supervisors of the county "may" require the applicant to transfer his property to the board, the net income therefrom to be paid to the owner and in the event of discontinuance of aid or death of the recipient the remainder of the property over and above the amount of aid paid to be returned to him or his estate. Provision was also made, under certain circumstances, for the recovery of excess aid paid when the recipient's property or income exceeded the amount allowed under the act.

Double the amount paid was recoverable if upon the death of the recipient his property or income was found to be greater than that permitted under the act. Such, briefly, were the provisions for reimbursement that existed until 1935.

In this latter year, the provision for transfer of the recipient's property to the county was repealed and section 4 of the act was amended (Stats. 1935, p. 1769) to provide, in substance, that aid granted to any person under the provisions of the act "shall constitute a debt of such person" to the state and county participating in the granting thereof and that upon the filing by the board of supervisors with the county recorder of a notice of the granting of aid such notice "shall have the force, effect and priority of a lien of a judgment", which lien "shall be deemed security for reimbursement to the state and county" for the amount of aid paid. The provisions for the recovery of "excess" aid when the recipient's property was found to exceed the allowed value, though amended, remained substantially the same as in the original act and as outlined above.

Therefore, in 1935, for the first time, provision was made for what may be termed a statutory lien which was to serve as security for reimbursement to the state *and county* for aid given under the act. In May, 1937, when the Old Age Security Act was incorporated in and made a part of the Welfare and Institutions Code (Stats. 1937, chap. 375), which code was adopted at the same legislative session and went into effect immediately as an urgency measure (Stats. 1937, chap. 369), sections 2224 and 2225 of said code became the successor sections to or the counterparts of the former amended section 4 of the original Old Age Security Act in that they, too, provided that aid granted to persons under the provisions of said chapter of the Welfare and Institutions Code should constitute a debt of the recipient to the state and county (sec. 2224) and that upon the filing with the county recorder of a notice of granting of aid, such notice should have the force, effect and priority of a judgment lien and should be security for the reimbursement to the state and county of the amount of such aid (sec. 2225). Subsequently, and at the same legislative session, these sections were amended (Stats. 1937, chap. 405), effective September 1, 1937, so as to shift the debt or liability created for aid so granted from the recipient thereof to a spouse or adult

child pecuniarily able to support said recipient (sec. 2224) and so as to omit all provisions for a statutory lien and purportedly to discharge all liens theretofore imposed for such relief (sec. 2225).

Inasmuch as our problem turns upon the construction and effect of the amended section 2225, effective, as stated, September 1, 1937, we quote it *verbatim:* "2225. Aid granted under the provisions of this chapter shall not constitute a lien upon any property of the recipient and all liens and mortgages heretofore created under the provisions of this chapter are hereby released and the board of supervisors of each county is hereby directed and authorized to execute and record appropriate instruments of release."

█ The foregoing legislative history discloses that from 1935 until September 1, 1937, a *statutory lien* was accorded to the counties as security for reimbursement to them for aid granted under the act. Upon the latter date, by legislative edict all such liens *"and mortgages"* were purportedly "released" and the counties authorized and "directed" to execute and record appropriate instruments of release, and this, whether or not the property continued to be owned by the person who received the aid and whose property was made subject to the lien as security for reimbursement. In other words, section 2225 of the Welfare and Institutions Code, as it now reads, purports to wipe out and destroy all such liens heretofore impressed even though the properties encumbered thereby are now owned by third persons who purchased or acquired the same from the recipients of the aid *subject to* such liens. In fact, of the eight "typical" cases alleged in the petition, of which typical cases concededly several hundred or more of each type or class exist throughout the state, at least three are of a type or class wherein the property *has* passed subject to the lien to an heir or grantee of the recipient of the aid. █ To release and discharge the lien in favor of such persons, as section 2225, *supra*, purports to do, in our opinion constitutes a gift to them of "public money or thing of value" in violation of section 31 of article IV of the Constitution. In the event of personal inability or refusal of the recipient of the aid to reimburse the participating governmental agencies for the aid so granted, such agencies must look for reimbursement to the security of the lien theretofore imposed. To destroy the se-

curity by release of the lien may in many cases forever preclude such reimbursement to the financial loss of the participating governmental agencies and the aggrandisement of the heirs or grantees alone, who took subject thereto.

In addition, the petition sets forth another "typical" case, of which many other similar cases allegedly exist in the state, wherein the recipient, whose property was made subject to lien for the aid granted, was not at any time entitled to such aid because of ownership by him at all times of property of a value in excess of that allowed by the act. Because the recipients in this class of cases did not acquire such excess property subsequent to their application for and receipt of aid and are not now deceased, sections 2222 and 2223 of the Welfare and Institutions Code which provide for reimbursement in such instances, are not applicable to the situation. We are satisfied, therefore, that to release and wipe out the liens heretofore imposed upon the properties of persons who, it now develops, never were entitled to aid, likewise constitutes, as in the other three typical cases above mentioned, a gift of "public money or thing of value" in violation of the constitutional provision.

■ In so far as the amendment of section 2225, effective September 1, 1937, purports to release *all* liens theretofore imposed for aid granted under the old age security law, including, as stated, liens on property of persons never entitled to aid and liens on property now in the hands of heirs or grantees who took or purchased subject thereto, the section is fatally defective and invalid, and this, even if we assume, without deciding, that legislation may constitutionally be framed looking to the release of such statutory liens as may exist under other classes of "typical" cases alleged in the petition. This is so, for the reason that a statute which is not severable and which by its express terms permits an application the effect of which is unconstitutional, is invalid even though its provisions also permit and contemplate another and different application with a legal and proper effect.

This proposition found expression in the case of *City of Los Angeles* v. *Lewis*, 175 Cal. 777 [167 Pac. 390], wherein was involved a statute authorizing a county to own, lease or operate a cement manufacturing plant and to sell its products. It was urged that this amounted to taxation for a private purpose, which made the statute unconstitutional in that

it authorized the county to sell the cement to private persons. In opposition thereto it was replied that the only action contemplated under the statute was for public purposes and reference was made to the rule which favors a construction and presumption in favor of constitutionality. In disposing of the issue this court declared, page 783, that ■ "It has been said that to save even a legislative enactment nothing can be read into it nor read out of it. The supreme test of the validity of any such law is not what may have been done under it, not, as here, what the contracting parties may by convention agree to do or not to do under it, but it is what *may be* done under it. . . . No man can doubt but that under this law a county acquiring a cement plant is authorized to manufacture all of the cement which that plant can produce and sell all that it desires to private consumers. To deny this right and power under the law is to destroy the law itself and to frame a law distinctly the contrary of that which the legislature deliberately and advisedly formulated and passed. So plain is this that respondents cannot successfully urge the severability of the statute and that a part of it can be saved by a construction limiting the cement production to the public needs of the county. For this, as we have said, would be to make a law which the legislature has not made and which requires legislative deliberation and determination before it can be made."

To the same effect see *Matter of Lambert,* 134 Cal. 626, 634 [66 Pac. 851, 86 Am. St. Rep. 296, 55 L. R. A. 856].

As stated above, section 2225 expressly and unequivocally provides that *"all"* liens theretofore created or imposed for aid granted *"are hereby released"* and the counties are *"directed"* to execute instruments evidencing such release. Paraphrasing the language of the Lewis case, *supra,* no man can doubt but that under this section a county is authorized and directed to release a lien in favor of a third party ineligible for any relief or aid. To deny this right and power under the section is to destroy the section itself, and to frame a section distinctly the contrary of that which the legislature deliberately and advisedly formulated and passed. So plain is this that petitioner cannot successfully urge the severability of the section and that a part of it can be saved by a construction limiting the release of liens to those situations where the benefits would accrue to persons eligible for old age se-

curity. For this, as we have said, would be to make a law which the legislature has not made and which requires legislative deliberation and determination before it can be made. The section here involved, in so far as it purports to release "all" preexisting liens, is not susceptible of severability to allow application of the rule enunciated in *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282 [42 Sup. Ct. 106, 66 L. Ed. 239], cited with approval in *Max Factor & Co.* v. *Kunsman,* 5 Cal. (2d) 446, 468 [55 Pac. (2d) 177], for in each of such cases a reasonable classification was present. What has been said is fatal to the issuance of the writ as to any and all of the "typical" cases alleged in the eight counts of the petition.

In addition, as to at least seven of the eight alleged "typical" cases, the section is also constitutionally objectionable because of its impairment of the obligation of contract. In this connection it appears that all of the "typical" cases except that set forth in count one of the petition, involve rights and obligations accruing not alone under the *statutory* lien contemplated and imposed between 1935 and September 1, 1937, but rather rights and obligations flowing from a contractual relationship. That is to say, in the many hundreds of cases identical with the "typical" cases set forth in counts 2 to 8, inclusive, of the petition, the petitioner elected to avail itself in many instances not of the *statutory* lien then contemplated by and provided for in the act, but preferred to and did enter into a contractual relationship with the recipients of aid in all such cases, as a result of which it procured from them mortgages pledging their properties as security for the reimbursement of the aid so granted. For the amended section 2225, *supra,* to declare such mortgages theretofore executed "hereby released" and for it to "direct" execution and recordation of appropriate instruments evidencing such release as it purports to do, is to cause it to do violence to the federal and state constitutional provisions prohibiting the impairment of the obligation of contract. Nor may it successfully be contended that the section, as amended, undertakes to work a mere procedural or remedial change that may properly be given a retroactive operation. The decision in *Brown* v. *Ferdon,* 5 Cal. (2d) 226 [54 Pac. (2d) 712], precludes any such construction of the statute. In the cited case, it was sought to give a retro-.

active application to a statute which provided, in substance, that a deficiency judgment should not be rendered for the balance due upon any obligation secured by deed of trust or mortgage with power of sale, following the exercise of such power of sale, unless the notice of breach and election to sell was recorded at least one year before the date of sale. As to instruments executed prior to its enactment, the effect of the statute was to cause the beneficiary or mortgagee to either waive his right to a deficiency judgment or to wait nine months longer than he was formerly required to do before a sale of the property might be held to satisfy the debt. It was there declared that the attempted retroactive application of the statute could not be justified as a mere remedial change. The decision quotes from the authorities to the effect, *supra*, 231, that ''It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired''. The opinion then states that if the statute there involved be retroactively applied '' 'the right to a deficiency judgment has either been entirely taken away from the creditor, or he must wait an additional period of nine months before he may have judgment. *These are substantial rights which are either entirely abrogated or suspended, and the fact that this is accomplished by legislation which has to do with the remedy rather than the substance of the contract is not controlling.* . . . The remedy, where it affects substantial rights, is included in the term ''obligation of contract'', and the remedy cannot be altered so as to materially impair such obligations'. . . . Thus the contention now under consideration, if accepted, would work a change in the substantive rights of the creditor under the guise of a change in the remedy. . . . 'the existing remedy cannot be so altered as to take away or impair any of the rights given by the contract.' ''

The foregoing quotation is peculiarly pertinent to the present cause. Whether the amended section 2225 be regarded as a remedial change or otherwise, it purports to entirely destroy a substantive contractual right of the counties in and to the mortgages executed in their favor as security for reimbursement of the aid granted in reliance thereon. As stated above, in the event of refusal or inability of the recipients of such aid to make reimbursement, the counties

may look to the mortgages to recoup the advances made. To release such security by statute, is to interfere with and destroy a valuable substantial right under the contract.

We are not impressed with petitioner's argument that the language of section 12 of the Old Age Security Act, in effect with the adoption of that law in 1929 and carried into the Welfare and Institutions Code as section 2002, contemplated and authorized the amendment purporting to release "all liens and mortgages" imposed or created under the act. The section as originally enacted, and as it read when the liens and mortgages here involved were imposed or created, provided that "Any and all aid granted under the provisions of this act shall be deemed to be granted and held subject to the provisions of any law that may hereafter be enacted amending or repealing in whole or in part the provisions of this act, *and no recipients under this act shall have any claim for compensation or otherwise by reason of his aid being affected in any way by any such amending or repealing act.*" The entire section must be read as a whole. The latter and italicized portion thereof definitely indicates to us that it was the legislative intention that the recipient of "aid" under the act should not, under any circumstances, acquire a vested right thereto but should at all times receive the same subject to a change in or repeal of the act. This is the only reasonable construction of which the section is susceptible. It is interesting to note that throughout the history of this section the marginal notes thereto and the title thereof undertook to so describe its purpose. (See Stats. 1929, p. 916; Welfare and Institutions Code, sec. 2002.) The use of the word "aid" throughout the section fortifies our construction thereof. Obviously, the section was not intended to affect the rights of the county under the act. Nor do we think this result was achieved by the placing of a period where a comma formerly existed, thereby splitting the section into two sentences when it was incorporated into the Welfare and Institutions Code. As so punctuated, it must still be interpreted as herein indicated. We are of the view, therefore, that as to liens and mortgages imposed or created prior to the 1937 amendment of section 2225, *supra,* the rights of participating counties had become fixed and vested.

What we have said, in our opinion, is determinative of this proceeding. Contentions of counsel not specifically men-

tioned herein have been considered and found to be without merit or not indispensable to our determination of the cause.

We do not feel that our conclusion herein in any way interferes with a legislative policy having for its purpose the giving of aid to indigents, as that term is commonly understood. It appears from petitioner's points and authorities that as security for some $960,000 advanced under the act it holds approximately 4,000 mortgages on real property valued at approximately $3,000,000. That such property should remain as security, as originally contracted, for the repayment of said amount does not appear unreasonable or harsh. The money recouped thereby may then be made available for other needy causes, thus tending to foster a policy of public assistance to those entitled thereto.

The demurrer is sustained, the alternative writ is discharged and the peremptory writ is denied.

Shenk, J., Curtis, J., Edmonds, J., Langdon, J., and Seawell, J., concurred.