[Civ. No. 30925. First Dist., Div. Three. Dec. 17, 1973.]

CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION et al., Plaintiffs and Appellants, v.
SUNNYVALE ELEMENTARY SCHOOL DISTRICT OF SANTA CLARA COUNTY et al., Defendants and Respondents.

48

50

**COUNSEL**

Richard H. Perry, Johnson & Stanton and Thomas E. Stanton, Jr., for Plaintiffs and Appellants.

William M. Siegel, County Counsel, Robert T. Owens, Deputy County Counsel, Paul, Hastings, Janofsky & Walker, David B. Harriman and Donald A. Daucher for Defendants and Respondents.

**OPINION**

**CALDECOTT, J.**—This is an appeal from a judgment upholding the validity of an agreement, designated the "SCORE" Agreement,[1] between respondent School Research and Service Corporation (SRS) and respondent Sunnyvale Elementary School District and other school districts, providing for the performance by SRS of research and development work and services for the school districts.

Appellant California School Employees Association (CSEA) and appellant California Teachers Association (CTA), commenced this action on behalf of themselves and their respective members. They asked the court to enjoin Sunnyvale and SRS from paying or receiving public school funds pursuant to the SCORE Agreement which they had signed, and to enjoin SRS from receiving public school funds pursuant to a SCORE or similar agreement from any other school district in Santa Clara County or soliciting such an agreement from any such district. Thereafter, appellants amended their complaint to seek as additional relief a declaratory

---

[1]Schools Cooperating On Research for Education.

judgment that the SCORE Agreement was illegal and void as a whole; that specific provisions of the agreement were likewise illegal and void and that public funds paid or to be paid pursuant to such agreement or similar agreements were and would be illegally expended.

SRS is a private stock corporation organized under the California General Corporation Law primarily to engage in the installation of carpeting in schools and the performance of custodial and maintenance services for schools and school districts. The SCORE Agreement is a contract between SRS and various school districts whereby the participating school districts pay a fee to SRS in exchange for the provision by SRS of certain research and development services. The basic overriding purpose of the program is to enable school districts to collectively obtain the results of massive research and development that are unavailable from public sources and which research and development no individual school district could afford to undertake on its own. This collective effort is manifested in "initial projects" involving transportation and custodial services, and in "general projects" as may be approved for SRS research by its advisory board composed of representatives of the participating districts. The agreement also provides for attention to a participating district's individual problems in that SRS is required to assist the district in adopting the results of "initial" and "general" projects to a district's particular needs. A district can request "specific" projects at no extra cost, as long as the total costs for these specific projects do not exceed 35 percent of the subscription fee.

Following are the relevant provisions of the SCORE Agreement between Sunnyvale and SRS.

### AGREEMENT

"WHEREAS School Research and Service Corporation ('SRS') has for several years been conducting, and in the future will continue to conduct, research and development programs concerned, *inter alia,* with the development of new and improved techniques, methods and systems for the management and control of school property and equipment; and

"WHEREAS, SRS and its personnel have demonstrated expertise in the areas of finance, economics, accounting, engineering and administration, which expertise is an essential ingredient in such research and development programs; and

"II. For purposes of this AGREEMENT the terms 'INITIAL PROJECTS,' 'GENERAL PROJECTS' and 'SPECIFIC PROJECT' shall have the following meanings:

"A. INITIAL PROJECTS shall mean the programs defined in Appendix B attached hereto, and/or such other initial programs as shall be mutually agreed between SRS and SUBSCRIBER;

"B. GENERAL PROJECT shall mean a program of research and development which has a goal of general interest to more than one SUBSCRIBER, and which is undertaken by SRS pursuant to guidance from the ADVISORY BOARD as described in Section XI, below;

"C. SPECIFIC PROJECT shall mean a program of research and development, study, consultation or other professional assistance which is undertaken at the specific request of an individual SUBSCRIBER pursuant to Section VII, below, and is not necessarily of interest to any other SUBSCRIBER.

"IV. During the term of this AGREEMENT SRS shall carry out research and development upon the INITIAL PROJECTS, and shall use its best efforts to achieve the objectives set forth for those research and development programs.

"VI. With respect to the research and development carried out pursuant to Section IV, and subject to the cost provisions of Section IX, SRS shall to the extent requested by SUBSCRIBER consult with and/or assist SUBSCRIBER in adapting the results to SUBSCRIBER's particular use.

"VII. Subject to the cost provisions of Section IX, SRS shall carry out SPECIFIC PROJECTS as requested by SUBSCRIBER.

"VIII. A. Any physical products (for example manuals, equipment, supplies, furnishings, and fixtures) which result from, or the availability of which is made known by, research and development programs conducted by SRS pursuant to this AGREEMENT, and which SRS then manufactures or otherwise acquires and sells, shall be made available by SRS for purchase by SUBSCRIBER on a reimbursed cost basis. If SUBSCRIBER is obligated to make such purchases through public bidding procedures, SRS will submit a bid on the aforesaid reimbursed cost basis. All physical products purchased by SUBSCRIBER pursuant to this Section VIII shall belong to SUBSCRIBER subject to the obligations of Section XV and the license of Section XVI.

"IX. A. Requests by SUBSCRIBER for services under Sections VI and VII are to be performed by SRS without further compensation so long as

the costs thereof as defined in Subsection C of this Section IX do not in the aggregate exceed, as of the time the requested services are rendered by SRS, thirty-five percent (35%) of the total fees actually paid by SUB-SCRIBER to said time pursuant to Section X.

"XVI. It is understood and expressly agreed that SRS shall retain and own all rights in the nature of ideas, inventions, literary and artistic products and the like, as well as any patents or copyrights resulting therefrom, said ideas, etc., collectively referred to herein as 'intellectual property,' developed by SRS under this AGREEMENT."

It should be noted that appellants also rely on two promotional brochures which introduced the SCORE scheme. One promotional brochure was attached as an exhibit to interrogatories served by CSEA and CTA upon SRS. Brochure I was issued and distributed to school districts prior to the time the SCORE program was begun. The brochure was not admitted into evidence. A second promotional brochure was attached as an exhibit to the answers made by SRS. Brochure II was issued and distributed to school districts after the commencement of the SCORE program. Brochure II was admitted into evidence.

SRS began operating the SCORE program on May 1, 1969. At that time there were 12 participating school districts, including Sunnyvale. Some of the general projects offered by SRS are listed as follows: (1) Custodial operations program; (2) Preventative maintenance program; (3) Management development program for school principals; (4) A "negotiations support service" for district negotiators.

Specific projects include: the organization and staffing of business services; assessment of the electronic data processing services and a high school administration study.

The custodial operations program was the only SCORE project implemented by Sunnyvale. On February 15, 1970, Sunnyvale terminated its agreement with SRS.

*The SCORE Agreement Does Not Constitute a Transfer of a Part of the Public School System to an Authority Which Is Not Included Within That System*

Appellants contend that the SCORE Agreement constituted a transfer of a part of the public school system to an authority which is not included within that system, contrary to the provisions of article IX, section 6, of the California Constitution. Appellants did not raise this issue in any

form before the trial court. Respondents suggest that appellants are barred from relying upon this theory on appeal. Respondents rely on *Ernst* v. *Searle,* 218 Cal. 233, 240-241 [22 P.2d 715], which states that a party on appeal is not permitted to change his position and adopt a new and different theory on appeal.

*Ernst* v. *Searle* can be distinguished from the case at bar. In *Ernst,* appellants raised for the first time on appeal a contention contrary to the facts and clearly contrary to the theory upon which the case was tried. (*Supra,* at p. 240.) ■ Although this particular theory of recovery was not advanced by plaintiffs in the trial court, it is settled that a change in theory is permitted on appeal when a question of law only is presented on the facts appearing in the record. (*Ward* v. *Taggart,* 51 Cal.2d 736, 742 [336 P.2d 534]. See also *Oakland Municipal Improvement League* v. *City of Oakland,* 23 Cal.App.3d 165, 171 [100 Cal.Rptr. 29]; *Burns* v. *State Compensation Ins. Fund,* 265 Cal.App.2d 98, 104 [71 Cal.Rptr. 326].)

■ Article IX, section 6 of the California Constitution provides in part that: "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them. *No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System."* (Italics added.)

■ Appellants claim that the provisions of the SCORE Agreement and the explanatory brochures issued by the respondent SRS make clear that the agreement has resulted in the transfer of important functions in the operation of public schools to the control of a private corporation.

It is true that the SCORE Agreement removes some research and development activities from the member districts. It is also true that such activities are paid for out of funds held in trust for school purposes. However, the appellants' claim that "[r]esearch and development activities in the public schools are clearly a part of the Public School System, as defined in the Constitution (Article IX, § 6)," is unfounded. Neither article IX, section 6, nor case law, specifies which activities are clearly a part of the public school system or which activities cannot be transferred to an outside authority. Appellants cite no legal authority for its conclusion.

It is clear from early cases that the general purpose of article IX, section 6[2] was to adopt one uniform system of public school education; the term "system" itself imparting unity of purpose as well as entirety of operation. (*Kennedy* v. *Miller,* 97 Cal. 429, 432 [32 P. 558]; *San Francisco* v. *Hyatt,* 163 Cal. 346 [125 P. 751].)

More recently, in the case of *Lehmann* v. *L. A. City Board of Education,* 154 Cal.App.2d 256 [316 P.2d 55], the court held that the provisions of article IX, section 6, did not prevent the schools from being subject to the safety regulations of the State Division of Industrial Safety. Though the *Lehmann* case can be distinguished from the case at bar, the general principle of the case is that article IX, section 6, is a fluid provision, one that must be interpreted by the facts of each case.

Research and development activities, though affecting education in the public school system, occupy an entirely different field from that of the actual teaching process, and thus do not infringe on the prohibition of article IX, section 6. Research and development is a means of improving education and directly affects the education of children, but it is not part of the teaching process. Even if one accepts that research and development with respect to services auxiliary to classroom instruction are part of the public school system there is not a *transfer* to other than the public school system. *The word "transfer" is defined as "to make over the possession or control."* (Webster's Seventh New Collegiate Dict.)

The SCORE Agreement does not "make over possession or control" of any part of the school system to SRS. The particular school district or an "advisory board" made up of the representatives of various school districts take part in the decision process as to which of the various projects SRS is to research or develop. As respondents point out, the evidence before the trial court indicates that the function of SRS pursuant to the SCORE Agreement is *advisory only.* SRS exercises no actual control over the participating school districts, but rather provides such service as is requested by the districts.

If it were true, as appellants argue, that any agreement with an outside agency to perform nonteaching-related functions, was a transfer of a part of a public school system to an outside authority, then arguably a school district could never contract with any outside agency to provide research and development services in particular, or for that matter, any services.

[2]Note that the present section was adopted in 1946.

Such is not the law in California. In *California School Emp. Assn.* v. *Sequoia etc. School Dist.,* 272 Cal.App.2d 98 [77 Cal.Rptr. 187], the court specifically approved the operation of a cafeteria vending machine. There the school district discontinued operation of its own cafeteria. Sections 1071, 1072, and 15955 of the Education Code and section 53060 of the Government Code specifically authorize school districts to contract with outside authorities for services. Such contracts for services do not represent a prohibited transfer to an outside authority.

Considering the above analysis, it is clear that the SCORE Agreement does not violate article IX, section 6 of the California Constitution.

### *The SCORE Agreement Does Not Involve a Giving or Lending of Credit or a Gift of Public Funds to a Private Corporation Contrary to Article XIII, Section 25 of the California Constitution*

Appellants' second argument is that the SCORE Agreement violates article XIII, section 25 of the California Constitution. This provision provides in part that: "The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State, or of any . . . political corporation or subdivision of the State now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, . . . or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, . . . or other corporation whatever; nor shall it have power to make any gift or authorize the making of any gift, of any public money or thing of value to any individual, . . . or other corporation whatever; . . ." Appellants' basic objection to the SCORE Agreement is as follows: That public school funds are being paid to and received by SRS, a private corporation "without a contractual commitment that the districts will receive anything of tangible value other than five custodial manuals"; that SRS is not assuming the normal risks of a private entrepreneur; that its activities are almost entirely underwritten by public funds provided by the member-subscriber districts. For fees ranging from $10,000 per year to $40,000 per year, the member districts receive: five custodial operation manuals, subject to an obligation to keep the manuals confidential; an agreement by SRS to carry out research and development on two "initial projects," special and other projects; specific projects on request; general projects with the consent of an advisory board; purchase from SRS on a "reimbursed cost" basis of any products from the projects; and SRS retains and owns "all rights in the

nature of ideas, inventions, literary and artistic products," copyrights and patents developed from any of the projects, etc.

From the above, appellants conclude that the SCORE Agreement constitutes a gift of public funds and/or the giving or lending of the credit of a political subdivision of the state in aid of and to a private corporation. Such is not the case.

To constitute a gift of public funds contrary to article XIII, section 25, payment of public funds must be without an adequate consideration. (25 Ops.Cal.Atty.Gen. 91, 93.) Appellants cite *County of Alameda* v. *Ross*, 32 Cal.App.2d 135 [89 P.2d 460] and *County of Los Angeles* v. *Jessup*, 11 Cal.2d 273 [78 P.2d 1131], for their assertion that the SCORE Agreement constitutes a gift of public funds. In both of these cases the statute or contract failed because of a lack of consideration. Consideration is simply the conferring of a benefit upon the promisor or some other person or the suffering of a detriment by the promisee or some other person. (1 Witkin, Summary of Cal. Law, Contracts, § 66, p. 70.) Consideration, if it consists of a benefit, must have some value. (Witkin, *supra,* § 68, p. 71.) There is no doubt that SRS has conferred a benefit upon the promisor and in return has suffered a detriment.

Appellants present no evidence nor articulate any agreement showing that the credit of the State was given or loaned to SRS. Appellants only show that SRS began this program with the intent of achieving a profit. Appellants say that SRS had been financed *primarily* by contributions from participating school districts. This is incorrect. The trial court found that: "The 'Score' program, during the last calendar year, has operated at a loss. Defendant SRS has made up the deficit of approximately $30,000.00 by applying additional capital to the program. The school districts participating in the 'Score' program are not subsidizing SRS, and on the contrary, SRS, a private enterprise, is carrying the 'Score' program through by the infusion of private capital."

### The SCORE Scheme Is Not Authorized by Section 1071, Subdivision (a), of the Education Code

The trial court erred when it found that the SCORE Agreement was authorized by section 1071, subdivision (a), of the Education Code.

Section 1071, subdivision (a), provides as follows: "The governing board of any school district may: (a) Conduct studies through research and investigation as are determined by it to be required in connection with the

present and future management, conditions, needs, and financial support of the schools; or join with other school district governing boards in the conduct of such studies." Section 1071, subdivision (a), grants the governing board power to conduct studies in connection with school management. It does not provide that the governing board of any school district may *contract* with an outside agency for these studies.

Thus, section 1071, subdivision (a), cannot be relied on by respondent as a source of authority for the SCORE Agreement.

### The SCORE Program Is Authorized by Section 53060 of the Government Code

It has long been held in California that "[s]chool boards have only such authority as is specifically granted by the Legislature, to be exercised in the mode and within the limits permitted by the statute." (*Elder* v. *Anderson,* 205 Cal.App.2d 326, 333 [23 Cal.Rptr. 48]; see also *Hutton* v. *Pasadena City Schools,* 261 Cal.App.2d 586, 589 [68 Cal.Rptr. 103].)

Section 53060 of the Government Code grants such authority. It provides as follows: "The legislative body of any public or municipal corporation or district may contract with and employ any persons for the furnishing to the corporation or district special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required."

Appellants argue that school districts may not enter into the SCORE Agreement pursuant to Government Code section 53060 because the services provided by SRS through the SCORE Agreement are *not* special and, even if they are special, there are state and local agencies willing and able to provide the same services.

The leading cases dealing with the ability of school districts to contract with outside agencies pursuant to section 53060 are *Jaynes* v. *Stockton,* 193 Cal.App.2d 47 [14 Cal.Rptr. 49] and *Cobb* v. *Pasadena City Bd. of Education,* 134 Cal.App.2d 93 [285 P.2d 41]. The test as to whether a school district may contract for services under Government Code section 53060 depends on the nature of the services; the necessary qualifications required of a person furnishing the services; and the availability of the service from public sources.

In the *Jaynes* case, the court held that the services rendered by a private law firm to a school district were not "special" within the meaning of

Government Code section 53060 where a private law firm hired by the school district and the county counsel were equally trained, experienced and the county counsel was willing and able to perform the services for the school district and also under a legal duty to do so. In *Cobb,* the court upheld the ability of a school district to hire and pay an architect pursuant to section 53060.

Furthermore, the trial court below specifically found that the services offered by SRS under the SCORE Agreement are "special" within the meaning of section 53060 of the Government Code.

Whether a service is "special" within the meaning of section 53060 is a question of fact. (*Jaynes* v. *Stockton, supra,* at p. 53.) As such, if the finding of the trial court with respect to whether the services are special is adequately supported by substantial evidence, it should not be disturbed. (*Supra,* at p. 53.) The evidence introduced at trial supports the trial court's finding that the services were special.

The trial court below also found that the SRS personnel are "professional, highly trained and educated, experienced and extremely competent in the fields in which they render said services." The evidence at trial supports this finding of fact.

The only question remaining is whether the services contracted for under the agreement are available to school districts from public sources in the sense that there is a public agency available and presently able to provide the services. The trial court found that there were none available.

Appellants argue that if this court were to look at the advertising brochure put out by SRS it would find that *some* of the potential areas of services listed in the brochure are theoretically available to school districts through other sources in the State and thus the SCORE Agreement is void because it is not authorized by section 53060. Appellants' argument is without merit.

The trial court found that the appellants did not produce any evidence that any of these services were or are available from the State Board of Education, the county superintendent of schools, the school districts involved in the SCORE program or any other State agency. Several witnesses for the respondents testified that the SCORE services were not available from any public source.

Appellants also allege that these services are available from other public

sources and cite several sections of the Education Code[3] as evidence of available programs.

These sections generally provide for commission studies dealing with educational advancement. Appellants do not show that the services *now* provided for by SRS, pursuant to the SCORE Agreement, are presently available to the school districts. Nor do such sections as appellants argue, indicate a legislative intent that section 53060 is not available to authorize school districts to contract with private contractors for research and development services. Appellants fail to cite any sources indicating such a generalized intent.

### *The SCORE Agreement Does Not Violate Education Code Sections 13252 and 13581*

■ Appellants argue that the SCORE Agreement violates sections 13252 and 13581 of the Education Code. Section 13252 of the Education Code provides that: "Governing boards of school districts shall employ persons in public school service requiring certification qualifications as provided in this code."

Section 13581 of the Education Code, in pertinent part provides: "The governing board of any school district shall employ persons for positions not requiring certification qualifications. The governing board shall, except where Article 5 (commencing at Section 13701) of this chapter or Section 13756 applies, classify all such employees and positions. The employees and positions shall be known as the classified service. Substitute and short term employees, employed and paid for less than 75 percent of a school year, shall not be a part of the classified service. Part-time playground positions, full-time day students employed part time, apprentices and professional experts employed on a temporary basis for a specific project, regardless of length of employment, shall not be a part of the classified service."

Section 13581 of the Education Code has been the subject of at least two court decisions in the last few years. In *California Sch. Employees Assn.* v. *Willits Unified Sch. Dist.*, 243 Cal.App.2d 776 [52 Cal.Rptr. 765], the court held that a school district could not contract with an outside agency to supply janitorial services and that section 13581 required the district in some instances to employ classified personnel. (*Id.* at p. 784.)

---

[3] Education Code sections 153, 262, 263, 551, 552, 553, 575, 575.1, 576-582.1, 583-583.9, 584-584.6, 585-585.7, 586-586.6, 587-587.17, 6478-6479.1, 6490-6498, 6499.31-6499.46, 6499.51-6499.61, 6499.200-6499.218, 6961-6966.7.

It said, however, that "[i]t is not necessary for us to designate which employees other than janitors may be covered by section 13581. Affected directly by the decision . . . are janitors only." (*Id.* at p. 784.)

It is not clear why the court concluded that janitors are covered by section 13581. Three possible reasons appear in the case. (1) The immediate predecessor to section 13581 specially designated that janitors be employed by the school district rather than be contracted for. (2) It is especially important that school districts maintain close control over janitors employed because they keep the key to the door of the school and come into close contact with the children. (3) Section 13581 applies to all those to be employed by the school district; the obligation of the statute cannot be avoided by contracts. Only those specifically exempted are not to be made a part of the "classified service." Those specifically exempted include part-time playground positions, full-time day students employed part-time, apprentices and *professional experts* employed on a temporary basis for a specific project, regardless of length of employment.

In *California School Emp. Assn.* v. *Sequoia etc. School Dist., supra,* 272 Cal.App.2d 98, the court upheld the power of a school district to abolish its cafeteria, terminate the classified employees working in the cafeteria and contract with an outside agency to operate food vending machines on the school premises. The court further held that the employees of the vending machine company did not have to be classified because those employees did not conduct their activities on the school premises. (*Id.* at p. 110.)

For the reasons cited below, one can reasonably conclude that a school district *need not* employ certified or classified employees to conduct the research and development activities available through the SCORE program, i.e., section 13581 is inapplicable to the case at bar as section 13581 specifically exempts from its classification requirements "professional experts employed on a temporary basis for a specific project, regardless of length of employment. . . ."[4] The SCORE program fits such a definition. Furthermore, those employed by SRS to conduct the research and development studies pursuant to the SCORE Agreement need not work on the school premises and do not come into close daily contact with teachers and students. Also section 13581 is intended to strengthen the position of non-certified school employees by classifying them. (*California Sch. Employees*

---

[4]Appellants argue that in light of sections 13581.3 and 13712 of the Education Code, the exemption applies only to experts directly employed by the school districts. However, section 13581 does not indicate such a limitation.

*Assn.* v. *Willits Unified Sch. Dist., supra.*) Certain rights and protections are afforded them pursuant to sections 13580-13655 of the Education Code. Persons outside the school system, especially temporary professional experts, would not be in need of such protection.

### The SCORE Agreement Does Not Violate Section 15951 of the Education Code

■ Section 15951 of the Education Code provides that: "The governing board of any school district shall let any contracts involving an expenditure of more than four thousand dollars ($4,000) for work to be done or more than eight thousand dollars ($8,000) for materials or supplies to be furnished, sold, or leased to the district, to the lowest responsible bidder who shall give such security as the board requires, or else reject all bids. This section applies to all materials and supplies whether patented or otherwise."

Section VIII of the SCORE Agreement provides that if a subscribing school district is required to purchase through public bidding procedures physical products, ". . . which result from, or the availability of which is made known by, research and development programs conducted by SRS, . . ." SRS will submit a bid to furnish such products on a reimbursed cost basis. Reimbursed cost is defined as excluding "any profits or research and development costs" and any "license fees, royalties, or other charges for 'intellectual property.' " The appellants say that this procedure discourages other potential bidders, thus violating the spirit of section 15951. Appellants' argument must be rejected.

First, there was no evidence introduced at trial that the volume of physical products sold by SRS to participating school districts was on any occasion sufficiently large to have required submission of bids. Thus, it is questionable whether section 15951 applies at all to the SCORE Agreement.

Second, appellants cannot argue that the entire research and development agreement be made the subject of competitive bidding. In *Cobb* v. *Pasadena City Bd. of Education,* 134 Cal.App.2d 93 [285 P.2d 41], the court held that the enactment of Government Code section 53060 removes any question of the necessity of advertising for bids for special services by a person especially trained and experienced. (*Id.* at p. 95.) In *Cobb* the employment of an architect could properly be made without competitive bidding. (*Id.* at p. 95.)

As argued above, the research and development costs involved in the SCORE Agreement are "special services" as required by section 53060 of the Government Code. It follows that such services are not subject to competitive bidding.

This leaves the physical product which the SCORE Agreement makes available to the school districts at cost. This physical product, where applicable, is the subject of competitive bidding. The SCORE Agreement does not discourage other bidders.

### Performance of the Provisions of the SCORE Agreement Does Not Require Any Violation of the California Public Records Act

Appellants contend that section XI of the SCORE Agreement requires subscribing districts to violate the California Public Records Act (Gov. Code, §§ 6250-6260.)

Section 6253 of the Government Code provides that: "Public records are open to inspection at all times during the office hours of the state or local agency and every citizen has a right to inspect any public record, except as hereafter provided. Every agency may adopt regulations stating the procedures to be followed when making its records available in accordance with this section."

Whether the information and conclusions of the research and development program provided to the SCORE school districts are public records need not be dealt with here. Article XV, subdivision C of the SCORE Agreement *permits* the disclosure of any confidential material where there is a reasonable and proper need for the material, on the condition that the person receiving the material agrees not to publish or sell it. This condition attached to the permission to disclose the SCORE material is clearly within the statutory right quoted above in section 6253 of the Government Code, of every state agency to adopt regulations stating the procedures, to be followed when making its records available in accordance with the act. Article XV of the SCORE Agreement is consistent with the basic policy of section 6252 et seq. that the public records should be open to the public.

Furthermore, the SCORE Agreement comes within one of the exceptions to the Public Record Act provided for in section 6254 of the Government Code. "Except as provided in Section 6254.7, nothing in this chapter shall be construed to require disclosure of records that are: . . . (k) Records the disclosure of which is exempted or prohibited pursuant to provisions of federal or state law, including, but not limited to, provisions of the Evidence Code relating to privilege."

Section 6254, subdivision (b) is broad enough to include trade secrets (the subject of article XV). Under section 1060 of the Evidence Code, the owner of a trade secret (SRS) is privileged to refuse to disclose and to prevent another from disclosing the secret. (*Uribe* v. *Howie*, 19 Cal.App.3d 194 [96 Cal.Rptr. 493].)

It must also be noted that appellants failed to introduce any evidence that performance pursuant to the SCORE Agreement resulted in a single violation of the Public Records Act. As respondents point out, the appellants are attempting to have this court declare void a contract which they believe commands the school district to behave in a manner contrary to the provision of several laws, but they cannot point to one instance in which such a violation has occurred.

### The Provisions of the SCORE Agreement Do Not Violate the Open Meeting Provisions of Education Code Section 966 or Government Code Section 54950

■ Appellants argue that section XV of the SCORE Agreement prevents a school board from discussing the contents of materials received from SRS under the SCORE Agreement at open school board meetings in violation of section 966 of the Education Code and section 54950 of the Government Code.

Basically section 966 of the Education Code provides that "all meetings of the governing board of any school district" must be open to the public.[5]

The policy behind this provision is declared in section 54950 of the Government Code. "In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly. . . ." In view of the above

---

[5]"Except as provided in Section 54957 of the Government Code or in Section 967, all meetings of the governing board of any school district shall be open to the public, and all actions authorized or required by law of the governing board shall be taken at such meetings and shall be subject to the following requirements: (a) Minutes must be taken at all such meetings, recording all actions taken by the governing board. Such minutes shall constitute public records, and shall be available to the public. Until the governing board adopts such minutes as the official minutes, such minutes shall be labeled the unadopted minutes. The official minutes shall also constitute public records and shall be available to the public. (b) A list of items that will constitute the agenda for all regular meetings shall be posted at a place where parents and teachers may view the same at least 48 hours prior to the time of said regular meeting, and, in the case of special meetings, at least 24 hours prior to said special meeting."

requirements, appellants argue, section XV of the agreement would prevent the district board from discussing or even referring to a writing received from SRS at any of its meetings since any such discussion would constitute a "showing" of the writing to the public.

Appellants' argument is without merit. First, they fail to show a single violation of the open meeting provisions of the Education or Government Code. Second, the SCORE Agreement in no way prohibits or inhibits public meetings and deliberations. Third, it is impossible to reconcile appellants' position with the express provisions in the Public Record Act, discussed above, which permits a local agency (e.g., a school board) to receive information in confidence. (Cf. *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.,* 263 Cal.App.2d 41, 57 [69 Cal.Rptr. 480].) Four, as already stated, section XV of the agreement provides for release of such information if there is "a reasonable and proper need" for such information or conclusions.

### The Provisions of the SCORE Agreement Do Not Violate The Provisions of the Winton Act

Appellants contend that the confidentiality requirement of section XV of the SCORE Agreement restricts the exchange of information between the district board and the representatives of employees' organizations and thus calls for a direct violation of the board's obligation under the Winton Act (§ 13080 et seq. of the Ed. Code) to exchange information "freely" during the "meet and confer" process and is subversive of the purpose of the act to establish "uniform and orderly methods of communication between employees and the public school employers by which they are employed."

Section XV of the SCORE Agreement does not violate the employer's duty to meet and confer with the representatives of the employees. The Winton Act was designed to strengthen existing tenure, merit or civil service systems and other methods of administering employer-employee relations through establishment of uniform and orderly methods of communication between employees and employers. (*Berkeley Teachers Assn.* v. *Board of Education,* 254 Cal.App.2d 660 [62 Cal.Rptr. 515].) Further, section XV does not limit or curtail communication between employees and employers. Those individuals or organizations who have a reasonable and proper need for such information will be granted such information.

Also, the Winton Act itself, in section 13087 provides that a public school

employer must adopt reasonable rules and regulations for the administration of employer-employee relationships under the article and that such rules and regulations may include rules and provisions for: "(d) furnishing complete and accurate *nonconfidential* information pertaining to employment relations to employee organzations . . . ." (Italics added.) The implication is that an employer is *not* required to disclose to employees' associations information it receives in confidence. If, as argued above, the information supplied by the SCORE Agreement is confidential information, the Winton Act is inapplicable.

### The SCORE Agreement Does Not Violate
### Section 80 of the Education Code

Section 80 of the Education Code provides: "No funds shall be expended by a school district, a county board of education, or a county superintendent of schools to secure a copyright for any person or firm, but nothing in this section shall be construed to prevent the governing board of any school district or county board of education from securing copyrights, in the name of the district or board, to all copyrightable works developed by the school district or board."

Appellants argue that because section XVI of the SCORE Agreement provides that SRS "shall retain and own all rights in the nature of ideas, inventions, literary and artistic products and the like, as well as any patents or copyrights resulting therefrom," a participating district in the SCORE program is violating section 80 of the Education Code by helping to secure a patent for a private individual or firm.

Reading section 80, along with its companion, section 81,[6] it is apparent that section 80 was designed to prevent a school district from paying money directly toward effectuating the copyright process on behalf of a person or firm. The securing of any copyrights available to SRS is done by SRS directly and not by any of the participating districts. Under the SCORE Agreement a participating district is spending money in order to obtain the results of research and development and *not* to secure a copyright from any firm or person.

The SCORE Agreement does not violate section 80 of the Education Code.

---

[6]"A school district . . . shall not use the regular worktime of any employee to secure a copyright for any person or firm . . . ."

### The Trial Court Erred When It Excluded Answers of Respondent SRS to Certain Interrogatories, but Such Error Was Not Prejudicial

 Appellants offered into evidence answers to interrogatories obtained from the respondent SRS. Respondent objected to the offer on the ground that the answers were "not a substitute for testimony" and "that they did not constitute evidence." The court ruled, on the authority of *Mayhood v. La Rosa,* 58 Cal.2d 498 [24 Cal.Rptr. 837, 374 P.2d 805], that the answers would be admissible if they contained admissions.

The trial court excluded two of respondent's answers to interrogatories on the ground that the negative answer to each of these interrogatories did not constitute an admission. The court erred when it excluded respondent's answers because they were not admissions. "[A]ny prior statement of a party may be offered against him, even though it may not have been against his interest or even may have been self-serving . . . ." (Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 498, p. 470.) Here, respondent's prior statements are not against his interest but are statements of a party relevant to the case at trial.

Even if the exclusion of the negative answer by the trial court was error, such error was harmless because the persons responsible for answering interrogatories were present in court; were available for any questions the appellants might have wanted to ask; and were called as witnesses. The appellants could merely have asked the same question as posed in the interrogatories directly of the parties. (Cf. *California C. P. Growers v. Williams,* 11 Cal.2d 221, 233 [78 P.2d 1154]; *Hanna v. Pipes,* 92 Cal.App.2d 106, 112 [206 P.2d 399]; *Dietl v. Heisler,* 188 Cal.App.2d 358, 370 [10 Cal.Rptr. 587].) Furthermore, appellants allege prejudice from the trial court's error but do not specify any supposed harm that was done by the refusal to admit the answers to interrogatories.

### The Exclusion From Evidence of a Promotional Brochure Distributed by SRS Was Not Error

 At several points during the trial the appellants attempted to have admitted into evidence a brochure describing the SCORE program. This brochure, appellants allege, was a 23-page promotional brochure describing the nature and objectives of the SCORE program. The brochure was placed into use after SRS had contracted with Sunnyvale, but prior to the initiation of the SCORE program on May 1, 1969. The trial court refused to admit

this brochure into evidence because the court felt that it was not relevant to any of the issues in the case.

The court was justified in excluding the brochure from the evidence. The issues in the case revolved around the legality of the SCORE Agreement and therefore the only evidence relevant was the agreement itself and the performance under the agreement.

### *The Refusal to Permit Appellants to Introduce Evidence and Pursue Inquiries Relating to the Handling and Expenditure by SRS Of Funds Was Not Error*

Appellants sought to introduce into evidence statements of account issued by SRS to Sunnyvale and other subscribing school districts which showed that large sums had accumulated in the 35 percent accounts of most of the districts, and sought to interrogate witnesses called by respondents with regard to the significance of these accumulations. They also sought to interrogate representatives of SRS with regard to the measures being taken to protect the funds received from subscribing districts against loss and the auditing procedures applicable to SRS's operations. The trial court sustained objections to all these efforts.

Respondents based their objections on the ground of irrelevancy. The complaint was not for an appropriation of money but rather the complaint alleges that the contract was illegal for a number of reasons and therefore Sunnyvale had no authority to spend the public money.

The trial court pursuant to section 352 of the Evidence Code has discretion to exclude evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time." In light of the wide discretion left the trial judge and in light of the pleading and other evidence taken at trial, the trial judge did not commit error.

### *The Terms of the SCORE Agreement and the Performance Required by SRS Are Sufficiently Definite and Certain to Provide an Enforceable Contract*

Appellants next argue that the scope of the duties of SRS under the SCORE Agreement, and the limits of acceptable performance by it, are too uncertain and indefinite to provide a legal basis for the expenditure of public funds.

Appellants are concerned because the agreement does not specifically

set out approaches to each project. Appellants state that: "The agreement . . . is so uncertain, so conjectural, that neither the subscribing districts, nor the taxpayers, . . . nor the Court can determine whether or not SRS has performed acceptably or been guilty of breach, nor could SRS be specifically required to perform any particular act or thing." Appellants' argument is without merit.

The trial court felt that the agreement was not so uncertain or conjectural that it could not determine whether or not SRS had performed acceptably, etc. Though complicated, the agreement sets forth definite and specific obligations to be performed by defendant SRS. Though this agreement is complex, in light of the fact that the subject matter of the contract was for research and development, the contract is specific and certain. It would severely limit the potential success of any research and development efforts to require the developer to follow a particular approach to a particular problem. ■■■ In determining the sufficiency of the subject matter of a contract, the purpose of the contract must be borne in mind. (*Rivers* v. *Beadle*, 183 Cal.App.2d 691 [7 Cal.Rptr. 170].)

Furthermore, one must keep in mind that the description of the subject matter of an agreement may be indefinite but if it is capable of being identified and rendered definite and certain the contract is enforceable. (*Rivers* v. *Beadle, supra,* at p. 697.) ■■■ Here the "general" and "specific projects" are capable of being identified and rendered definite and certain by the acts of the school districts. The contract is enforceable.

Perhaps the most important factor favoring upholding the validity of the SCORE Agreement is that it has been performed by the parties without difficulty and confusion for many months. Objections to the agreement are made now not by any party to the SCORE Agreement. Thus, even if the SCORE Agreement is indefinite, subsequent, satisfactory performance under the contract by the parties and their interpretation of that document have cured any defect. (*Bohman* v. *Berg,* 54 Cal.2d 787, 794-795 [8 Cal. Rptr. 441, 356 P.2d 185].)

### The Trial Court Did Not Err When It
### Entered Judgment in Favor of Sunnyvale

Appellants sought to enjoin the defendant school district and its officers and employees from pledging, obligating or paying any public school funds to SRS pursuant to the SCORE Agreement.

The evidence is uncontradicted, however, that the school district had

terminated its agreement with SRS some 14 months prior to the time of trial. Further, there is no evidence that Sunnyvale was solicited by SRS to renew the contract, or that it desired, considered, or contemplated renewing the contract or entering into a similar agreement.

Appellants argue that as taxpayers, they are entitled to a judicial declaration as to whether or not the moneys paid by Sunnyvale to SRS pursuant to the SCORE Agreement, have been legally expended so that they might seek appropriate relief. The appellants claim the public importance of the issue involved calls for an exception to the normal rules of mootness.

Appellants' position cannot be sustained. All the cases cited by appellants present situations where only one defendant was involved and if the case were dismissed because of mootness, the issues found to be recurring, could not be determined. Such is not the case here, as there is another defendant still in the case and the issues presented have been resolved.

The judgments are affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 14, 1974.