[No. B195835. Second Dist., Div. Three. Apr. 17, 2007.]

ROSA MENDOZA et al., Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants;
LOS ANGELES PARENTS UNION et al., Interveners and Appellants.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Stacy Boulware Eurie and Paul H. Dobson, Assistant Attorneys General, Christopher E. Krueger, Gregory M. Cribbs and Susan K. Leach, Deputy Attorneys General, for Defendants and Appellants Arnold Schwarzenegger, as Governor, John Chiang, as State Controller, and State Board of Education.

Rockard J. Delgadillo, City Attorney, Valerie L. Flores, Heather E. Davis and Harit U. Trivedi, Deputy City Attorneys, for Defendant and Appellant Antonio Villaraigosa, as Mayor of the City of Los Angeles.

Munger, Tolles & Olson, Vilma S. Martinez, Bradley S. Phillips, Daniel P. Collins and Paul J. Watford for Interveners and Appellants.

Kevin S. Reed, Donald L. Davis and Georgina C. Verdugo for Plaintiff and Respondent Los Angeles Unified School District.

Olson, Hagel & Fishburn, Deborah B. Caplan, N. Eugene Hill, Lance H. Olson, Erin V. Peth; Strumwasser & Woocher, Fredric D. Woocher, Michael Strumwasser; Milbank, Tweed, Hadley & McCloy, Gregory Evans, Alisa Schlesinger, Patricia J. Quilizapa and Paul M. Torres for Plaintiffs and Respondents Rosa Mendoza and Los Angeles Unified School District.

Parker & Covert and Henry R. Kraft for Plaintiff and Respondent Associated Administrators of Los Angeles.

Diane E. Watson, in pro. per., for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—Mayors in certain large cities around the country have been granted control of the school districts in those cities. Antonio Villaraigosa, the Mayor of the City of Los Angeles (the Mayor), sought similar control over the Los Angeles Unified School District (LAUSD) through state legislation. The California Constitution grants to the voters within the LAUSD the right to determine whether their board of education is to be elected or appointed. Therefore, the Legislature could not simply enact a statute granting the Mayor authority to appoint the members of the LAUSD Board of Education (the Board). Moreover, the California Constitution also prohibits the transfer of authority over any part of the school system to entities outside of the public school system. Therefore, the Legislature could not simply enact a statute transferring control over the LAUSD to the Mayor. The Legislature

attempted to avoid these prohibitions with the enactment of Assembly Bill No. 1381 (2005–2006 Reg. Sess.), known as the "Romero Act."

At issue in this appeal is the constitutionality of the Romero Act. At the heart of that statute are two main provisions: (1) the transfer of substantial power from the Board to the LAUSD District Superintendent (the District Superintendent), and the grant to the Mayor of authority to ratify the appointment of the District Superintendent; and (2) the transfer of complete control of three low-performing high schools (and their feeder schools) from the Board to a partnership led by the Mayor.

 We conclude that the Romero Act is an unconstitutional attempt to do indirectly what the Legislature is prohibited from doing directly. The Legislature cannot overrule the LAUSD's voters' determination that their Board is to be elected rather than appointed, nor may it transfer authority over part of the school system to entities outside of the public school system. We will therefore affirm the trial court's issuance of a writ of mandate preventing the enforcement of the Romero Act.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Controlling Constitutional and Related Education Code Provisions

Our discussion of the factual background of this case, as well as the political processes which led to the enactment of the Romero Act, is best understood in the context of the overall scheme of constitutional and statutory provisions establishing and governing the educational system in California.

The controlling constitutional provisions are found in article IX of the California Constitution. Section 1 provides that "the Legislature shall encourage by all suitable means" the promotion of education. The Constitution provides for three different types of agencies to govern education in California: state, county, and district.

At the statewide level, the Constitution provides for the election of a statewide Superintendent of Public Instruction. (Cal. Const., art. IX, § 2.) The Constitution also provides for a State Board of Education, and requires that the Legislature provide for its election or appointment. (Cal. Const., art. IX, § 7.)

At the county level, there is to be a county superintendent of schools and county board of education. (Cal. Const., art. IX, §§ 3, 7.) A county's charter may provide for an elected county board of education (Cal. Const., art. IX, § 3.3); in the absence of such a provision, the Legislature is to provide

whether the county board of education is elected or appointed (Cal. Const., art. IX, § 7). The Constitution leaves it to the voters of each county to determine whether the superintendent of schools is to be elected by the voters or appointed by the county board of education (Cal. Const., art. IX, § 3).

■ At the district level, the state is to be organized, by the Legislature, into school districts. "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts." (Cal. Const., art. IX, § 14.) The Constitution references the "governing boards" of school districts without specifically defining them. (*Ibid.*) The gap is filled by the Education Code, which provides that "[e]very school district shall be under the control of a board of school trustees or a board of education." (Ed. Code, § 35010, subd. (a).) The Constitution permits charter cities to establish, in their charters, "for the manner in which, the times at which, and the terms for which the members of boards of education shall be elected or appointed, for their qualifications, compensation and removal, and for the number which shall constitute any one of such boards."[1] (Cal. Const., art. IX, § 16.) Therefore, the board of education provided for in a city charter is the "governing board" of the relevant school district. The Legislature has provided that the governing board of any school district[2] may "employ" a district superintendent. (Ed. Code, § 35026.) The Legislature has imposed certain recordkeeping and reporting duties on the governing boards of school districts (Ed. Code, § 35250); the governing board is permitted to delegate any of these duties to the district superintendent (Ed. Code, § 35026). Governing boards of larger school districts[3] may also appoint a director of school building planning, to be responsible "for the coordination of the building program of the district." (Ed. Code, § 35045.)

Under the Constitution, the public schools themselves exist at the district level and are governed by the school districts. Section 5 of article IX provides, "The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year . . . ." (Cal. Const., art. IX, § 5.) "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to

---

[1] There are also provisions indicating that, when the boundaries of the school district expand beyond the boundaries of the city, any change to the city's charter regarding the board of education must be submitted to, and approved by a majority of, *all* of the voters within the school district, including those outside of the city. (Cal. Const., art. IX, § 16.)

[2] The provision is limited to those school districts employing eight or more teachers.

[3] The provision is limited to those school districts having an average daily attendance of 10,000 or more.

maintain them. No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System." (Cal. Const., art. IX, § 6.) Section 8 of article IX confirms that "[n]o public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the *exclusive* control of the officers of the public schools . . . ." (Italics added.)

"The Legislature may authorize the governing boards of all school districts to initiate and carry on any programs, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established."[4] (Cal. Const., art. IX, § 14.) The Legislature has done so. Education Code section 35160 provides, "On and after January 1, 1976, the governing board of any school district may initiate and carry on any program, activity, or may otherwise act in any manner which is not in conflict with or inconsistent with, or preempted by, any law and which is not in conflict with the purposes for which school districts are established."

### 2. *The LAUSD and the Battle for Its Control*

The LAUSD is the largest school district in California. It is divided into eight local districts that cover 28 municipalities and multiple unincorporated areas. It has 858 K-12 schools serving 727,000 students, and an additional 150,000 pre-K and adult students. The District's total budget is in excess of $13 billion per year. At least 80 percent of the students in LAUSD come from economically disadvantaged families; 43 percent of LAUSD students are English-language learners.

Los Angeles is a charter city. Section 801 of the Los Angeles City Charter provides for an elected board of education, containing seven members. In 2000, the Board hired a new superintendent, who centralized the district and implemented various reforms. The new programs have generated some

---

[4] This language was added in 1972, by Proposition 5. At the time, the Legislature was considering a bill to grant school district governing boards increased decisionmaking authority. The Legislative Counsel issued an opinion indicating that a constitutional amendment would be necessary to allow the Legislature to enact such a statute; on the basis that the Legislature did not then possess the constitutional authority to make the proposed delegation to school district governing boards. (Ops. Cal. Legis. Counsel, No. 7167 (Mar. 20, 1972) Powers of School Districts, pp. 1–4.) The ballot arguments both for and against Proposition 5 agreed that the proposition would have the effect of allowing the Legislature to delegate increased decisionmaking authority to local school boards. (Ballot Pamp., Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 5, pp. 14–15; *id.*, argument in opposition to Prop. 5, pp. 15–16.)

positive results. Elementary school student achievement on state assessments has improved since 2000; however, middle and high school students have not improved their test scores. While overall student performance data for LAUSD is not impressive, other school districts in California have achieved worse results. For example, 32.4 percent of LAUSD students are considered proficient in language arts and 38.1 percent are considered proficient in math. However, Santa Ana Unified School District students achieved only 26.8 percent and 33.5 percent respectively, and San Bernardino City Unified School District students had even lower numbers. When considering the levels of progress made, LAUSD's gains have outpaced statewide gains in several respects. Thus, while it cannot be disputed that LAUSD is not as successful as it should be, it also cannot be disputed that LAUSD is no worse than a number of other districts in California.

In some large cities across the country, mayors have sought and obtained authority over their local school districts. In the 2005 Los Angeles mayoral runoff election, the two candidates, then Mayor James Hahn and then Councilmember Villaraigosa, each announced that they would seek some measure of control over the LAUSD. Villaraigosa stated that, if elected, he would seek ultimate authority over the LAUSD, as in some other major cities. Villaraigosa was elected mayor on May 17, 2005.

During this time, then Los Angeles City Council President Alex Padilla and then Board president Jose Huizar had been meeting to discuss ways to identify the best strategy to improve student achievement in LAUSD. On April 27, 2005, the city council approved their plan for the creation of the Presidents' Joint Commission on LAUSD Governance. The commission began its work that summer, and, on July 31, 2006, issued its final report. The commission recommended streamlining the role of the Board and decentralizing decisionmaking. As the issue of mayoral control of the school district had been raised in the mayoral campaign, the commission specifically considered whether to recommend increased mayoral control of the school district. The commission recommended that the elected Board continue to govern the LAUSD but with the increased involvement of municipal leaders. The commission recommended that municipal leaders be given *input* into certain decisions, such as the selection of the District Superintendent, but not that they be given ultimate decisionmaking power. A minority of commission members issued a minority report concluding that "the LA Mayor must drive the ship of decentralization that will bring . . . improved student achievement and success . . . ." They therefore recommended that municipal leaders not only have *involvement* in the selection of the District Superintendent, but also the power to *ratify* the District Superintendent's selection.

In the meantime, the Legislature was considering legislation to give the Mayor power over the LAUSD. On August 18, 2005, the Legislative Counsel[5] issued an opinion on a then pending Senate bill which would have authorized the Mayor of Los Angeles, *upon making a finding of "educational failure,"* to fill by appointment any vacancies on the LAUSD Board of Education (and continue to fill such vacancies by appointment upon the expiration of the terms of incumbent board members). The Legislative Counsel concluded that the bill would be unconstitutional, in that it would violate Los Angeles's right under California Constitution, article IX, section 16, to choose whether its board of education members are elected or appointed. (Ops. Cal. Legis. Counsel, No. 0518337 (Aug. 18, 2005) Los Angeles Unified School District Board of Education: Mayoral Appointment of Members (S.B. 767) pp. 1, 5.)

The Legislative Counsel was then asked "whether authority or control over educational functions currently performed by a school district may be transferred by statute to the mayor of a charter city." On July 17, 2006, the Legislative Counsel issued its opinion that such a statute would be unconstitutional, in that it would violate California Constitution, article IX, section 6's prohibition against the transfer of any part of the public school system from the authority of the public school system to any authority outside the public school system. (Ops. Cal. Legis. Counsel, No. 0618549 (July 17, 2006) School District: Transfer of Authority to Mayor of Charter City, pp. 1, 7.) Finally, the Legislative Counsel was asked whether transferring control over the educational functions of a school district to the mayor of a charter city would be permissible if the county superintendent of schools were· given authority to oversee the mayor's performance. The Legislative Counsel concluded this would still be an unconstitutional transfer of power. (Ops. Cal. Legis. Counsel, No. 0620862 (Aug. 21, 2006) School District: Transfer of Authority to Mayor of Charter City, pp. 1, 4.)

### 3. *The Romero Act*

On September 8, 2006, the Romero Act was enacted into law. The Romero Act, which is called the "Los Angeles Unified School District: Gloria Romero Educational Reform Act of 2006," makes, by statute, several key changes in the governance of the LAUSD. Specifically, it adds a new chapter to the Education Code entitled, "Los Angeles Unified School· District Administration." (Ed. Code, pt. 21, ch. 5.) Section 35900 is added to the Education Code and sets forth the legislative findings that the Legislature believed justified

---

[5] The Legislative Counsel is selected on a nonpartisan basis by concurrent resolution of the Legislature. (Gov. Code, §§ 10201, 10203.) One of the primary duties of the Legislative Counsel is to assist in the preparation and consideration of proposed legislation. (Gov. Code, §§ 10231, 10234.) In practice, this frequently involves submission of opinions as to the constitutionality of a proposed statute.

the Romero Act. These findings include that the LAUSD "has unique challenges and resources that require and deserve special attention to ensure that all pupils are given the opportunity to reach their full potential." (Ed. Code, § 35900, subd. (a)(1).) The Legislature also found that "[t]he freedom to deviate from the strictures of generally applicable education statutes and regulations while maintaining the constant commitment to fairness and equity, and to increasing academic achievement among all pupils regardless of background, is central to the success of quality schools in California and is appropriate, as a concept, for the unique circumstances of the Los Angeles Unified School District." (Ed. Code, § 35900, subd. (a)(2).) The Legislature made *no* findings that LAUSD was failing in its obligation to deliver a constitutionally adequate education to its students.

### a. *The Council of Mayors*

The first major change brought about by the Romero Act is the establishment of the "Council of Mayors." The Council of Mayors is to be comprised of the elected mayor of each city any part of which is located within the attendance boundaries of the LAUSD.[6] (Ed. Code, § 35920, subd. (a).) The Council of Mayors acts "by 90 percent of the weighted vote of the total membership of the council. The weighted vote of each member of the [C]ouncil of [M]ayors is equal to the proportion of the population of the LAUSD that are residents of the city of the individual member . . . to the total population of residents of the LAUSD." (Ed. Code, § 35920, subd. (b).) It is undisputed that 82 percent of the LAUSD population resides in the City of Los Angeles. It is therefore clear that the Council of Mayors can take no action without the agreement of the Mayor. The key power granted to the Council of Mayors is the power to ratify the "appointment, contract term, contract renewal, refusal to renew a contract, or removal of the district superintendent."[7] (Ed. Code, § 35921, subd. (b).) While the statute requires the Council of Mayors to provide to the Board the *reasons* for its refusal to ratify any such decision of the Board (*ibid.*), it does not set any limits on the council's discretion to refuse to ratify. In short, the Council of Mayors provisions effectively grant to the Mayor complete veto power over the selection of the District Superintendent.

The District Superintendent of the LAUSD is, in turn, granted powers that far exceed the powers of the district superintendent of any other school

---

[6] For unincorporated portions of the county within the LAUSD, the appropriate member of the Los Angeles County Board of Supervisors is given a seat on the Council of Mayors.

[7] The Council of Mayors is also granted the right to select a representative to participate in all aspects of the selection and evaluation by the Board of the District Superintendent, including closed session meetings of the Board where such topics are discussed. (Ed. Code, § 35921, subd. (a).)

district in California. Education Code section 33050 provides that the governing board of a school district may, after a public hearing, request the State Board of Education to waive any controlling provision of the Education Code or governing regulation, with certain exceptions. Under the Romero Act, it is the *District Superintendent* of the LAUSD who can seek such a waiver, not the LAUSD Board of Education. (Ed. Code, § 35910, subd. (a).) Moreover, if the State Board of Education does not act on a waiver request by the District Superintendent within 60 days, the request is deemed approved for two years. (Ed. Code, § 35910, subd. (c).)

Other powers granted the District Superintendent by the Romero Act include: the "authority to assign and reassign a principal of a school within the LAUSD" (Ed. Code, § 35911, subd. (b)); the authority to make "all employment decisions for all nonrepresented personnel of the LAUSD" (Ed. Code, § 35911, subd. (f)); "authority over the contracting operations of the LAUSD, including, but not limited to, the negotiation and execution of contracts"[8] (Ed. Code, § 35912, subd. (a)(1)); the preparation of the proposed budget for the LAUSD, which is to be submitted to the Council of Mayors for review and comment and the Board of Education for final approval (Ed. Code, § 35913, subd. (a)); and the responsibility to "develop and manage the facilities program for the LAUSD," with the input of the Council of Mayors (Ed. Code, § 35915, subd. (a)(1), (2)).

In short, after the Legislative Counsel had indicated its belief that it would be unconstitutional for the Mayor to be statutorily granted *appointment power* over the Board, and that it would likewise be unconstitutional for the powers over education possessed by the Board to be statutorily *transferred* to the Mayor, the Romero Act transferred many of the powers over education possessed by the Board to the District Superintendent, and effectively gave the Mayor veto power over the appointment of the District Superintendent.

### b. *The Mayor's Partnership*

The second major change worked by the Romero Act is the creation of "The Los Angeles Mayor's Community Partnership for School Excellence" (Mayor's Partnership). (Ed. Code, § 35930.) The Mayor's Partnership is to consist of the Mayor, "in partnership with the LAUSD, parent and community leaders and organizations, and school personnel and employee organizations." (Ed. Code, § 35931, subd. (a)(1).) The Mayor's Partnership is to

---

[8] Were there any doubt, the Legislature added, "The intent of the Legislature in enacting this section is to transfer the responsibility for contracting operations, including appropriation and payment, from the board to the district superintendent." (Ed. Code, § 35912, subd. (c).) The Romero Act does not alter the rights or requirements of any applicable collective bargaining agreements or contracts. (Ed. Code, § 35912, subd. (c).)

exercise control, discussed in further detail below, over three "clusters" of low-performing schools in the City of Los Angeles, as a demonstration project. A school "cluster" consists of a poorly performing high school and its feeder middle and elementary schools, as well as other programs, including early childhood programs, continuation schools, and adult education programs. While the Romero Act is somewhat vague as to selection of the members of the Mayor's Partnership, it states that the Mayor "shall ensure that each of the clusters is represented in the partnership by at least two representatives from parent organizations who are not also employees of the district, at least two community leaders who are not from a parent or employee organization, and one classroom teacher, one classified employee, and one school administrator selected from those nominated by employee organizations of classroom teachers, classified employees, and school administrators, respectively, who are employed at a school within the cluster." (Ed. Code, § 35931, subd. (a)(2).) The LAUSD's participation is limited to one full-time employee appointed by the District Superintendent for each of the three clusters; that employee is required to perform the functions of the "Office of Parent Communication"[9] for the cluster of schools to which he or she is assigned. (Ed. Code, § 35931, subd. (a)(2), (3).)

The Mayor's Partnership's control of the cluster schools is complete. "Notwithstanding any other provisions of law, and except for the authority to negotiate and enforce collective bargaining agreements, all authority exercised by the board and the district superintendent with respect to the schools in the demonstration project shall be transferred to the [Mayor's Partnership]." (Ed. Code, § 35932, subd. (a).) This includes the authority to seek waivers from the State Board of Education and "authority to operate the schools in the demonstration project with maximum flexibility and efficiency." (*Ibid.*)

In order to take control over the three clusters of schools, the Mayor's Partnership is first required to seek approval from the county superintendent of schools. (Ed. Code, § 35930.5.) The county superintendent is required to act on a request for approval within 20 days. (Ed. Code, § 35930.5, subd. (b).) The county superintendent *shall* grant the request unless one of three specific conditions exist: (a) the Mayor and the Mayor's Partnership "are demonstrably incapable, and not likely to gain the capability before the project begins, of implementing a sound educational program at the schools

---

[9] The Romero Act creates the Office of Parent Communication and gives control of that office to the District Superintendent. The District Superintendent is required to "establish an Office of Parent Communication that may be staffed by an ombudsperson or similar employee. The office shall assure that the LAUSD complies with the processes for receiving and addressing parent complaints . . . and shall assure that the LAUSD complies with the requirements regarding parent information and the rights of parents to participate in the education of their children . . . ." (Ed. Code, § 35911, subd. (j).)

in the demonstration project"; (b) the Mayor and the Mayor's Partnership have "an irremediable and significant conflict of interest" in undertaking the project; or (c) the Mayor and the Mayor's Partnership "are demonstrably incapable, and not likely to gain the capability before the project begins, of providing sufficient financial oversight to ensure that the schools in the project are financially capable of sustaining a sound educational program and other operational services." (*Ibid.*) There is to be a progress report on the Mayor's Partnership by January 1, 2008. (Ed. Code, § 35940, subd. (a)(1).) Upon receiving the progress report, the county superintendent may withdraw authorization for the demonstration project, but only for one of the same three reasons for which approval could have been denied. (Ed. Code, § 35930.5, subd. (c).) Significantly, the county superintendent can only withdraw approval if the partnership is demonstrably incapable of implementing a "sound educational program," *not* if the partnership has implemented an educational program that proves to be less sound than the educational program previously implemented by the LAUSD at the cluster schools. In other words, the county superintendent cannot withdraw approval based on any *relative* determinations of the *success* of the educational program at the cluster schools, but must allow the program to continue as long as the educational program is "sound." Nor does the county superintendent have any powers to monitor or oversee the programs at the cluster schools run by the Mayor's Partnership.

In short, after the Legislative Counsel had indicated its belief that transferring control over the educational functions of a school district to the mayor of a charter city, with the county superintendent of schools being given authority to oversee the mayor's performance, would be unconstitutional, the Romero Act transferred the educational functions over *part* of the LAUSD to a partnership headed by the Mayor, with the county superintendent of schools permitted to invalidate that control under only very limited circumstances.

### c. *Provisions Relating to the Romero Act's Constitutionality*

The Legislature was clearly aware of the Legislative Counsel's opinions when enacting the Romero Act, and therefore took steps with the goal of ensuring the Romero Act's constitutionality. Thus, the general provisions of the Romero Act include a statement that "[i]t is . . . the intent of the Legislature that, in performing the school-related duties set forth in this chapter, the [C]ouncil of [M]ayors . . . and the [Mayor's Partnership] function as agencies authorized to maintain public schools, similar to a school district or county office of education. The [C]ouncil of [M]ayors and the [Mayor's P]artnership are, therefore, a part of the public school system of the state in performing the duties established in this chapter within the meaning of Section 6 of Article IX of the California Constitution." (Ed. Code, § 35900, subd. (e).) The clusters of schools that are under the control of the Mayor's

Partnership shall, by statute, "continue to exist as district schools, and employees at the schools shall be deemed to be district employees with all the rights of district employees." (Ed. Code, § 35932, subd. (b).) Those schools "shall continue to be funded with district resources," although the funding may be supplemented by private funding accounted for by the Mayor's Partnership. (Ed. Code, § 35932, subd. (c).) The Romero Act also specifies that "any liability incurred by any member of the [C]ouncil of [M]ayors or [Mayor's Partnership] in undertaking any of the functions described in this chapter shall be borne by the school district and not by the County of Los Angeles, or any of the cities within its boundaries." (Ed. Code, § 35900, subd. (f).)

### d. *Remaining Provisions of the Romero Act*

There are several other provisions of the Romero Act, which are not material to our main analysis. The Romero Act provides that the Southeast Cities Schools Coalition, comprised of several cities, shall have the power to ratify the selection of the local district superintendent serving those cities. (Ed. Code, § 35911, subd. (c).) The Romero Act contains provisions relating to the inspector general of the LAUSD (Ed. Code, § 35400). The Romero Act also contains provisions relating to the selection of instructional materials by the LAUSD, including that "[p]arents, teachers, and other certificated staff [shall] have an authentic and central role." (Ed. Code, § 35914, subd. (a)(1)(A).)

The entire Romero Act is repealed by its own terms on January 1, 2013, unless subsequent legislation deletes or extends that date.[10] (Ed. Code, § 35950.) There is no severability clause in the Romero Act.

### 4. *The Instant Action*

On October 10, 2006, a verified petition for writ of mandate challenging the constitutionality of the Romero Act was filed. The plaintiffs include the LAUSD and certain individuals and organizational entities opposed to the law. The named defendants are the State of California, the Governor, the State Controller, the State Board of Education, the county superintendent of schools, and the Mayor. Plaintiffs took the position that the Romero Act violated sections 5, 6, 8, 14 and 16 of article IX of the California Constitution.[11] On November 7, 2006, a group of individuals and organizational entities that support the Romero Act was permitted to intervene.

---

[10] The Los Angeles City Charter provides that the mayor may serve no more than two four-year terms in office. (L.A. Charter, §§ 205, 206.) If Mayor Villaraigosa is elected to a second term, the Romero Act would expire shortly before he leaves office.

[11] Additionally, plaintiffs alleged the Romero Act violated the home rule provisions of article XI, sections 3 and 5, and the equal protection guarantee of article I, section 7 of the California Constitution.

After substantial briefing and argument, the trial court issued its opinion granting the petition for writ of mandate. The lengthy and comprehensive statement of decision issued by the trial court held the Romero Act unconstitutional on every basis on which it had been challenged. Concluding the Romero Act was not severable, the court issued a writ of mandate prohibiting defendants[12] from enforcing or implementing the Romero Act in any way. The Governor, Controller, State Board of Education, Mayor, and interveners filed timely notices of appeal.[13] At the parties' joint request, we have heard this case on an expedited basis.

## ISSUES ON APPEAL

We are concerned solely with the constitutionality of the Romero Act. We first consider whether the Romero Act violates article IX, section 16 of the California Constitution, which grants charter cities the right to determine whether their boards of education are to be elected or appointed. We conclude that it does. We next consider whether the Romero Act violates article IX, section 6 of the California Constitution, which prohibits the transfer of control of any part of the public school system to any authority not included within the public school system. We conclude that it does. As we conclude that the Romero Act is unconstitutional on two separate bases, we see no need to consider the further challenges to its constitutionality. We next consider whether the unconstitutional provisions of the Romero Act can be severed and the remainder of the Romero Act allowed to stand. We conclude the Romero Act is not severable. We will therefore affirm the trial court's judgment issuing a writ of mandate prohibiting the implementation or enforcement of the Romero Act in its entirety.

## DISCUSSION

### 1. Standard of Review

"In deciding whether the Legislature has exceeded its power, we are guided 'by well settled rules of constitutional construction. Unlike the federal Constitution, which is a grant of power to Congress, the California Constitution is a limitation or restriction on the powers of the Legislature. [Citations.] Two important consequences flow from this fact. First, the entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative

---

[12] Judgment was, however, entered in favor of the State of California.

[13] Appellants are divided into two groups. Mayor Villaraigosa and the interveners filed a joint brief; the Governor, State Controller and State Board of Education filed another. When discussing their positions on appeal, we will refer to the groups respectively as "the Mayor" and "the State defendants."

powers which are not expressly or by necessary implication denied to it by the Constitution. [Citations.] In other words, "we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited." [Citation.] [¶] Secondly, all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." ' [Citations.] On the other hand, 'we also must enforce the provisions of our Constitution and "may not lightly disregard or blink at . . . a clear constitutional mandate." ' [Citation.]" (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284–285 [132 Cal.Rptr.2d 713, 66 P.3d 718].)

■ The "presumption of constitutionality is particularly appropriate where, as here, the Legislature has enacted a statute with the pertinent constitutional prescriptions in mind. 'In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision.' [Citation.] Finally, to void a statute on its face, '[those challenging it] cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . . Rather, [they] must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional provisions.' " (*Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1134 [89 Cal.Rptr.2d 745], fn. omitted.)

■ While legislative findings in support of a statute are "entitled to great weight," they "are not controlling." (*County of Riverside v. Superior Court, supra*, 30 Cal.4th at p. 286.) "A court may not simply abdicate to the Legislature, especially when the issue involves the division of power between local government and that same Legislature. The judicial branch, not the legislative, is the final arbiter of" the constitutionality of a statute. (*Id.* at p. 286.)

■ " 'Constitutional provisions adopted by the People are to be interpreted so as to effectuate the voters' intent, and if the intent is clear from the language used, there is no room for further judicial interpretation.' " (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 758 [16 Cal.Rptr.2d 727].) Principles of statutory construction apply equally to the interpretation of constitutional provisions. (*Id.* at p. 755.) Thus, for example, we are to read sections of the same article of the Constitution "not in isolation," but "together as a whole." (*County of Riverside v. Superior Court, supra*, 30 Cal.4th at p. 285.)

## 2. *The Romero Act Violates Article IX, Section 16 of the Constitution*

■ "[T]he Legislature's power over the public school system [is] 'exclusive, plenary, absolute, entire, and comprehensive, subject only to constitutional constraints.' " (*State Bd. of Education v. Honig, supra*, 13 Cal.App.4th at p. 754.) "Public education is an obligation which the State assumed by the adoption of the Constitution. [Citations.] The system of public schools, although administered through local districts created by the Legislature, is 'one system . . . applicable to all the common schools . . . .' " (*Butt v. State of California* (1992) 4 Cal.4th 668, 680 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) Management and control of the public schools is a matter of state care and supervision; local districts are the state's agents for local operation of the common school system. (*Id.* at p. 681.)

■ However, certain powers of local districts *are* enshrined in the California Constitution. Thus, California Constitution, article IX, section 16 *guarantees* to charter cities the right to provide "for the manner in which, the time at which, and the terms for which members of boards of education shall be elected or appointed, for their qualifications, compensation and removal, and for the number which shall constitute any one of such boards." Moreover, article IX, section 14 provides that "[t]he Legislature may authorize *the governing boards of all school districts* to initiate and carry on any program, activities, or to otherwise act in any manner which is not in conflict with the laws and purposes for which school districts are established." (Italics added.) In other words, while the Constitution does not *require* that the Legislature delegate any powers to the governing boards of local school districts, the *only entities* to which the Constitution *expressly* permits the Legislature to delegate powers regarding education are the very same governing boards that the Constitution *mandates* charter cities have the right to elect.[14]

It cannot seriously be disputed that the Romero Act substantially interferes with the Board's control of the district. The provisions relating to the Mayor's Partnership *completely divest* the Board of its powers of control over the three school clusters in the demonstration project. The provisions relating to the Council of Mayors work a somewhat more subtle, but no less substantial, interference. A great many of the powers otherwise accorded the Board are, by the Romero Act, transferred to the District Superintendent. The Board is then stripped of its otherwise statutory right to "employ" a district

---

[14] The Mayor cites to *Grigsby v. King* (1927) 202 Cal. 299, 304 [260 P. 789], for the proposition that local school boards are "administrative agenc[ies] created by statute and invested only with the powers expressly conferred, subject to the limitations thereto attached by the legislature." Yet article IX, section 16 of the California Constitution clearly provides that local school boards, far from being created by statute, are every charter city's constitutional right to design by charter.

superintendent, in that the approval and removal of that individual is now subject to the ratification of the Council of Mayors. Thus, it is clear that both major provisions of the Romero Act substantially interfere with the Board's powers of control over the district. One of the issues presented by this appeal is whether this interference violates the right of the citizens of Los Angeles to elect their board of education, as guaranteed by article IX, section 16 of the California Constitution.

■ We conclude that it does. It would be a clear violation of the plain language of article IX, section 16, if the Legislature passed a law giving the Mayor the right to appoint the members of the Board. But the constitutional provision would be annulled if the Legislature could simply bypass it by taking the powers of the Board away from that entity and giving them to the Mayor, or the Mayor's appointee. This is nothing more than an end run around the Constitution. If article IX, section 16 is to mean anything, it must mean that charter cities can not only choose the composition of their boards of education, but that charter cities are guaranteed freedom from legislative interference even when the Legislature is of the opinion that they have made the wrong choice.[15]

On appeal, the Mayor and State defendants argue that the Constitution's grant of the power to choose whether to elect a board of education is limited *only* to that power, and does not imply that any such elected board of education would have any particular powers or duties. The Mayor relies on *State Bd. of Education v. Honig, supra*, 13 Cal.App.4th 720, for this proposition, while the State defendants rely on *Cobb v. O'Connell* (2005) 134 Cal.App.4th 91 [36 Cal.Rptr.3d 170]. Both cases are distinguishable.

---

[15] While we need not determine whether the Romero Act's delegation of decisionmaking power over the cluster schools to the Mayor's Partnership is a violation of California Constitution, article IX, section 14's provision granting the Legislature the authority to delegate decisionmaking power to "the governing boards of all school districts," we find article IX, section 14 instructive. Proposition 5 (see fn. 4, *ante*), which adopted this language, was placed on the ballot because of a Legislative Counsel determination that the Legislature *lacked* the power to delegate decisionmaking authority to local governing boards in the absence of an express grant in the Constitution. When the voters considered whether to approve Proposition 5's language permitting the Legislature to delegate increased decisionmaking authority to the governing boards of local school districts, *article IX, section 16 provided voters in charter cities the right to elect their local governing boards.* It therefore appears that the voters understood that their approval of Proposition 5 would enable the Legislature to delegate increased authority only to the local governing boards that they could elect. There was never any suggestion that the Legislature somehow also possessed the authority to delegate increased decisionmaking power over local schools to a city's mayor and various appointees. (Cf. *Dean v. Kuchel* (1951) 37 Cal.2d 97, 99–100, 104 [230 P.2d 811] [holding that an express grant of permission to delegate legislative powers to one entity does not prohibit a delegation of such powers to another entity unless such powers are denied expressly or by necessary implication].)

State Bd. of Education v. Honig, supra, 13 Cal.4th at p. 729, was concerned with a "turf battle[]" between the State Board of Education and the Superintendent of Public Instruction (State Superintendent). By statute, the State Board of Education is the legislative, policymaking branch of the State Department of Education, while the State Superintendent is vested with executive functions. The State Board of Education adopted certain policies and sought a writ of mandate directing the State Superintendent to implement those policies. The State Superintendent took the position that he was under no clear ministerial obligation to do so. (Ibid.) At one point, the State Superintendent argued that the Legislature had exceeded its authority by designating the State Board of Education as the policymaking branch of the department of education. The State Superintendent argued that the framers of the California Constitution had "intended to place the Superintendent 'in charge and control of the public school system and the state education department.' " (Id. at p. 754.) He relied on article IX, section 2 of the California Constitution, which provides as follows: "A Superintendent of Public Instruction shall be elected by the qualified electors of the State at each gubernatorial election. The Superintendent of Public Instruction shall enter upon the duties of the office on the first Monday after the first day of January next succeeding each gubernatorial election." "Focusing on the language 'shall enter upon the duties of the office' and on portions of the debates of the 1878–1879 Constitutional Convention, the [State] Superintendent assert[ed] article IX, section 2 limits the Legislature's plenary authority to define the Superintendent's duties." (State Bd. of Education v. Honig, supra, 13 Cal.App.4th at pp. 754–755.) In short, the State Superintendent argued that the "duties of the office" the Constitution required him to perform could not be narrowed from the duties of the office which were then in existence when that language was adopted as part of the Constitution—those duties apparently including being in charge of the Department of Education. (Id. at p. 755.)

The Honig court disagreed, concluding that nothing in the plain language of article IX, section 2 limited the Legislature's authority to define the State Superintendent's duties, noting that, when the "duties of the office" language in question was adopted, the State Superintendent's duties were then defined by statute, and there was no reason to believe the constitutional language was intended to deprive the Legislature of the authority to ever amend the statute. (State Bd. of Education v. Honig, supra, 13 Cal.App.4th at p. 756.) The court added, "Nor does a commonsense reading of the language the Superintendent 'shall enter upon the duties of the office' create a right to take charge of and be in control of the public school system and the Department by virtue of that office alone. Our reading of article IX, section 2 is consistent with article IX considered as a whole. [Citation.] Although the Superintendent is a constitutional officer whose office cannot be extinguished by the Legislature, the

powers and duties of that office may, and have been, increased and diminished by the Legislature under its plenary authority." (*Id.* at p. 756.)

The above quoted language from *State Bd. of Education v. Honig, supra*, 13 Cal.App.4th at page 756, does not control our interpretation of article IX, section 16 of the California Constitution. The LAUSD does not question the power of the Legislature to increase or diminish the powers and duties of local boards of education; indeed, much of the Education Code can be seen as limits on the power of local boards of education. We are instead concerned with a *special law*[16] which provides that, although every other charter city in California may elect a board of education that can exercise all powers statutorily delegated to such local boards of education, Los Angeles may not. This case does not present a challenge to the Legislature's plenary power to limit the authority of local boards of education; it is a challenge to a legislative attempt to act where the voters of Los Angeles are given the exclusive power to act—to determine the composition of the local board of education. The Legislature cannot transfer a local board of education's powers to *a different entity* and then say the charter city has no right to determine the composition of *that* entity since it is not a board of education.

The State defendants fare no better with *Cobb v. O'Connell, supra*, 134 Cal.App.4th 91. To appreciate that conclusion, however, a brief discussion of *Butt v. State of California, supra*, 4 Cal.4th 668, is necessary. In April 1991, the Richmond Unified School District found itself in such dire financial straits that it intended to close the doors to its schools on May 1, thus cutting off the last six weeks of school. (*Butt v. State of California, supra*, 4 Cal.4th at p. 673.) Local parents brought suit against the state, seeking injunctive relief to keep the schools open. The trial court granted an injunction and the Supreme Court affirmed.[17] The Supreme Court concluded that allowing the Richmond Unified School District to close its doors would constitute a violation of its students' *equal protection* rights. Concluding that "[t]he State itself bears the ultimate authority and responsibility to ensure that its district-based system of common schools provides basic equality of educational opportunity" (*id.* at p. 685), the court upheld, as a proper exercise of the trial court's authority to enforce its constitutional judgments, a preliminary injunction requiring the State Superintendent to take over governance of the

---

[16] Article IX, section 14 of the California Constitution provides that "[t]he Legislature shall have the power, *by general law*, to provide for the incorporation and organization of school districts, high school districts, and community college districts, of every kind and class, and may classify such districts." (Italics added.) The trial court concluded the Romero Act violated this provision as well, as it is a special law altering the organization of the LAUSD.

[17] The Supreme Court was clear that its analysis was limited to an appeal from a grant of a preliminary injunction, not an appeal from a final judgment. (*Butt v. State of California, supra*, 4 Cal.4th at p. 678 & fn. 8.)

Richmond Unified School District (in conjunction with a substantial emergency loan) until a recovery and payment plan could be established.[18] (*Id.* at pp. 675, 694–697.) In the course of its opinion, the Supreme Court noted that, in extreme cases, the state has a duty to intervene to prevent unconstitutional discrimination at a local level. (*Id.* at p. 688.)

It was just such an extreme case that led to *Cobb v. O'Connell, supra,* 134 Cal.App.4th 91. In 2002, the Oakland Unified School District discovered that it had a deficit of $31 million, with another $50 million deficit projected for the following year. (*Id.* at pp. 93–94.) The Legislature stepped in with emergency legislation "to ensure that this fiscal crisis in the Oakland schools did not deprive students of their educational opportunities." (*Id.* at p. 94.) The state provided a $100 million loan, and temporarily transferred control of the schools to the state. The State Superintendent was to appoint an administrator to run the schools, with the local governing board remaining in an advisory capacity, for two years or until the projected completion of a specified plan to resolve the fiscal crisis. (*Ibid.*) Some Oakland residents brought suit, contending the temporary removal of authority from the elected school board violated the "home rule" provisions of the California Constitution and the Oakland City Charter.[19] The *Cobb* court disagreed. Specifically, it concluded that there was no conflict with the Oakland City Charter because, "[t]he Oakland school board continues to be elected as it always was before the emergency legislation, and the hiatus in the exercise of its ultimate responsibility is only temporary, during which period the board continues to serve an advisory role." (*Id.* at p. 97.)

*Butt v. State of California* and *Cobb v. O'Connell* are clearly distinguishable from this case. Those cases stand for the proposition that the state may, and in some circumstances must, interfere with a local school board's management of its schools when an emergency situation threatens the students' constitutional right to basic equality of educational opportunity. The Romero Act is not such legislation. The Romero Act makes no findings of crisis in the LAUSD schools. Indeed, it could not, as LAUSD schools are not the worst in the state by any measure. Instead, the Romero Act purports to justify its interference with the Board's authority on the basis that the LAUSD "has unique challenges and resources that require and deserve special attention to ensure that all pupils are given the opportunity to reach

---

[18] There was no challenge raised in *Butt* that the State Superintendent's takeover of the Richmond schools was unconstitutional. Instead, the *state* had appealed, arguing that its delegation of educational authority to local school boards prevented it from having any additional duties to come to the aid of troubled districts.

[19] They did not raise a challenge under article IX, section 16 of the California Constitution, although the court briefly mentioned that section's language in its opinion. (*Cobb v. O'Connell, supra,* 134 Cal.App.4th at p. 97.)

their full potential." (Ed. Code, § 35900, subd. (a)(1).) ▮ In the absence of any looming constitutional crisis, the "unique" circumstances of the LAUSD do not, alone, constitute a basis for depriving the citizens of Los Angeles of their right to an elected board running their school district. The Romero Act is therefore violative of article IX, section 16 of the California Constitution.

### 3. *The Romero Act Violates Article IX, Section 6 of the Constitution*

We next consider article IX, section 6 of the Constitution, which provides, in pertinent part, "The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them. *No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System.*" (Italics added.)

▮ "It is clear from early cases that the general purpose of article IX, section 6 was to adopt one uniform system of public school education; the term 'system' itself imparting unity of purpose as well as entirety of operation." (*California Sch. Employees Assn. v. Sunnyvale Elementary Sch. Dist.* (1973) 36 Cal.App.3d 46, 57 [111 Cal.Rptr. 433], fn. omitted.) Providing a single system of public schools "means that the educational system must 'be uniform in terms of the prescribed course of study and educational progression from grade to grade.' " (*Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 1137.) The purpose of article IX, section 6 of the California Constitution is to guarantee that "the ability of that *system* to discharge its duty fully is not impaired by the dissipation of authority and loss of control that would result if parts of the system were transferred from the system or placed under the jurisdiction of some other authority." (*California Teachers Assn. v. Board of Trustees* (1978) 82 Cal.App.3d 249, 254 [146 Cal.Rptr. 850].) It is "a fluid provision, one that must be interpreted by the facts of each case." (*California Sch. Employees Assn. v. Sunnyvale Elementary Sch. Dist., supra,* 36 Cal.App.3d at p. 57.)

To determine whether the Romero Act violates this provision, we first decide whether the Council of Mayors and Mayor's Partnership are entities within the public school system. As we conclude that they are not, we then address the question as to whether the Romero Act *transfers* part of the school system to these entities.

a. *The Council of Mayors and Mayor's Partnership Are Not
Public School System Entities*

Article IX, section 6 of the California Constitution provides that, in addition to the public schools themselves, the school system includes "the school districts and the other agencies authorized to maintain them." We therefore must determine whether the Council of Mayors and Mayor's Partnership are agencies authorized to maintain the schools.[20]

Our analysis begins[21] with an acknowledgement that the Romero Act specifically declares that the Council of Mayors and the Mayor's Partnership *are* part of the public school system. "[I]t is . . . the intent of the Legislature that, in performing the school-related duties set forth in this chapter, the [C]ouncil of [M]ayors . . . and the [Mayor's Partnership] function as agencies authorized to maintain public schools, similar to a school district or county office of education. The [C]ouncil of [M]ayors and the [Mayor's P]artnership are, therefore, a part of the public school system of the state in performing the duties established in this chapter within the meaning of section 6 of Article IX of the California Constitution." (Ed. Code, § 35900, subd. (e).) While this determination is entitled to great weight, it is not controlling. We repeat, "A court may not simply abdicate to the Legislature, especially when the issue involves the division of power between local government and that same Legislature." (*County of Riverside v. Superior Court, supra*, 30 Cal.4th at p. 286.) To put it another way, the Legislature may not, by means of legislative declaration, foreclose or limit the scope of judicial examination and review of the constitutionality of a legislative enactment. As a result, the *substance* of the Romero Act must be evaluated on its merits, quite apart from any legislative declaration designed to address expressed constitutional concerns.

---

[20] An examination of the voter materials for the proposition that added this language provides no insight into the voters' intent. (Ballot Pamp., Gen. Elec. (Nov. 5, 1946) summary and arguments related to Prop. 3, pp. 4–5.)

[21] Preliminarily, we reject the Mayor's contention that the article IX, section 6 prohibition against the transfer of part of the public school system does not apply to acts of the Legislature. The Mayor takes the position that, since the Legislature can authorize entities to maintain the public schools, any entity authorized by the Legislature to do so is, by necessity, part of the public school system. We disagree. As the Supreme Court stated in a slightly different context, "The act of delegation does not change a private body into a public body and thereby validate the very delegation the [Constitution] prohibits." (*County of Riverside v. Superior Court, supra*, 30 Cal.4th at p. 294.) Similarly, we conclude the act of delegation of authority over a part of the public school system does not change the entity to whom the authority was delegated *into* a part of the public school system. Moreover, if the Legislature could delegate authority over the public schools *at will*, there was little purpose in the voters' adoption of article IX, section 14, a provision then deemed necessary in order to give to the Legislature the authority to delegate increased authority over the public schools to "the governing boards of all school districts." (See fns. 4 & 15, *ante*.)

The critical question, therefore, is whether the Council of Mayors and the Mayor's Partnership can be deemed to be a part of the public school system for any reason *other* than the Legislature's bald declaration that they are. The Council of Mayors is effectively directed by the Mayor, as it can take no action without his agreement. Likewise, by its terms, the Mayor's Partnership is "directed" by the Mayor. Yet the Mayor is not part of the public school system. The Mayor is an elected official who, according to the city charter, is "the Chief Executive Officer of the City." (L.A. Charter, § 230.)

Article IX of the California Constitution governs education in California. It provides for a State Superintendent and Board of Education; county superintendents and boards of education; and local school districts with governing boards. *These* are the entities *constitutionally authorized* to maintain public schools, and we conclude they are, therefore, the only entities referred to in article IX, section 6. (See *Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 1142 [each entity provided for in art. IX is an entity authorized to maintain schools in our public school system and is therefore part of the public school system].) As the Council of Mayors and the Mayor's Partnership[22] are not article IX entities, they are not part of the public school system.

b. *The Romero Act Transfers Part of the Public School System to the Mayor's Partnership and Council of Mayors*

The Constitution, article IX, section 6 provides, in pertinent part, "No school or college or any other part of the Public School System shall be, directly or indirectly, *transferred from* the Public School System or *placed under the jurisdiction of* any authority other than one included within the Public School System." (Italics added.) This provision is violated only by transfers of *control.* (*California Sch. Employees Assn. v. Sunnyvale Elementary Sch. Dist., supra,* 36 Cal.App.3d at p. 57.) When, for example, an entity outside the school system acts in an *advisory capacity only,* there is no prohibited transfer, because the outside entity "exercises no actual control" over the school system entities. (*Ibid.*)

The prohibition is not violated by a statute allowing school districts to contract with private driver training schools to provide driver training, when the private driver training schools would be " 'under the exclusive control and management of the governing board of the school district and shall

---

[22] We are unpersuaded by the suggestion that the presence of a single representative of the LAUSD in the Mayor's Partnership with respect to each cluster transforms the Mayor's Partnership into a part of the public school system. This is particularly the case where, as here, the duties of the LAUSD employee are not supervisory, but simply defined as running the Office of Parent Communication.

comply with all rules and regulations of the State Board of Education relating to driver training offered by the public schools [with the exception that teaching credentials would not be required].' " (*California Teachers Assn. v. Board of Trustees, supra,* 82 Cal.App.3d at p. 252.) This is so because the statute simply allows school boards to delegate a portion of the teaching function to be "done under the control and supervision of the school district." (*Id.* at p. 255.) However, "if the control and management of the driver training program were to be transferred to a private school," a constitutional violation would occur. (*Id.* at p. 256.) "This would be true not because the teaching function may not be transferred, but because the school districts and the other agencies authorized to maintain the schools within the public school system are also a part of the system, and article IX, section 6 prohibits placing any part of the system under the jurisdiction of any authority other than one included within the system. A transfer of control would indirectly transfer a part of the administrative system." (*Ibid.*)

Similarly, the Charter Schools Act of 1992 (Ed. Code, § 47600 et seq.), which allowed the creation of charter schools "free from most state laws pertaining uniquely to school districts," also did not effect an unconstitutional transfer of control. (*Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 1130.) As the *Wilson* court explained, "we wonder what level of control could be more complete than where, as here, the very destiny of charter schools lies solely in the hands of public agencies and offices, from the local to the state level: school districts, county boards of education, the Superintendent and the [State Board of Education]. The chartering authority[23] controls the application approval process, with sole power to. issue charters. [Citations.] Approval is not automatic, but can be denied on several grounds, including presentation of an unsound educational program. [Citation.] Chartering authorities have continuing oversight and monitoring powers, with (1) the ability to demand response to inquiries concerning financial and other matters [citation]; (2) unlimited access to 'inspect or observe any part of the charter school at any time' [citation]; and (3) the right to charge for actual costs of supervisorial oversight [citation]. As well, chartering authorities can revoke a charter for, among other reasons, a material violation of the charter or violation of any law. [Citation.] Short of revocation, they can demand that steps be taken to cure problems as they occur. [Citation.] The [State Board of Education], upon recommendation from the Superintendent, can also revoke any charter or take other action in the face of certain grave breaches of financial, fiduciary or educational responsibilities. [Citation.] Additionally, the [State Board of Education] exercises continuous control over charter

---

[23] The "chartering authority" can be either a local school district governing board, a county board of education, or the State Board of Education. (*Wilson v. State Bd. of Education, supra,* 75 Cal.App.4th at p. 1132.)

schools through its authority to promulgate implementing regulations. [Citations.] Finally, public funding of charter schools rests in the hands of the Superintendent." (*Id.* at pp. 1139–1140, fn. omitted.) As charter schools are under the jurisdiction of chartering authorities, and the chartering authorities themselves are within the public school system, there is no violation of California Constitution, article IX, section 6. (75 Cal.App.4th at p. 1142.)

We analyze the provisions of the Romero Act in the context of this framework. We turn first to the three clusters of schools that are part of the demonstration project. As to these schools, the Romero Act transfers all authority "exercised by the [LAUSD Board of Education] and the district superintendent" to the Mayor's Partnership. (Ed. Code, § 35932, subd. (a).) Unlike the driver training programs at issue in *California Teachers Assn. v. Board of Trustees, supra*, 82 Cal.App.3d 249, in which the programs remained under the exclusive management and control of the governing boards of the school district, these three clusters of schools are *taken from* the management and control of the LAUSD Board of Education. Moreover, the panoply of controls exerted by public school system authorities over the charter schools at issue in *Wilson v. State Bd. of Education, supra*, 75 Cal.App.4th 1125 are not present here. The county superintendent must approve of the demonstration project unless one of three narrowly drawn conditions exist. Moreover, the county superintendent has only two windows of opportunity in which to act: within 20 days of the initial application, and after the intermediate review in January 2008. Indeed, for the five years between January 2008 and January 2013, the county superintendent has *no* authority to terminate the demonstration project, even if, to take an extreme example, the Mayor's Partnership appears demonstrably incapable of implementing a sound educational program at the schools.[24] There are no continuing oversight or monitoring powers.[25] No public school system authority is authorized to demand responses to inquiries concerning financial or other matters. There is no unlimited access to inspect or observe any part of the

---

[24] Indeed, if the Mayor is not reelected to a second term, a new individual will direct the Mayor's Partnership from July 2009 to January 2013, without *any* opportunity for the county superintendent to review any changes in the operation of the cluster schools the new mayor may choose to make.

[25] In his reply brief, the Mayor argues that Education Code section 1240 provides the county superintendent with continuing authority over the schools in the demonstration project. That section sets forth the general duties of a county superintendent of schools, including the duty to "[v]isit and examine each school in his or her county at reasonable intervals to observe its operation and to learn of its problems." (Ed. Code, § 1240, subd. (c)(1).) Yet the "priority objective" of those visits is to determine: (a) that sufficient textbooks are present; (b) that the facility does not pose an emergency or urgent threat to health or safety; and (c) the accuracy of the school accountability report card with respect to textbooks and facilities. (Ed. Code, § 1240, subd. (c)(2)(E).) What is missing is any provision providing the county superintendent any authority to cure problems, or demand that the Mayor's Partnership cure problems, discovered at the schools.

demonstration project schools at any time. There is no provision for public school system authorities to terminate the demonstration project for a violation of law. There is no provision for public school system authorities to demand steps be taken to cure problems as they occur. There is no provision for the State Board of Education to take corrective action (or terminate the program) in the face of grave breaches of financial, fiduciary, or educational responsibilities.[26] While the clusters of schools in the demonstration project are still subject to the governing statutes, when waivers have not been obtained, it is apparent that the very *purpose* of the demonstration project is to give complete operational control over these schools, for six years, to the Mayor's Partnership. In the absence of any real oversight by public school system authorities, this is unconstitutional.

 With respect to the provisions of the Romero Act regarding the Council of Mayors, the question is somewhat closer. The Romero Act transfers many elements of management and control over the schools in the LAUSD from the Board to the District Superintendent. Standing alone, these provisions do not work a violation of article IX, section 6 of the Constitution, in that the District Superintendent, as a Board employee, is a part of the public school system. However, the Romero Act goes further and gives the Council of Mayors the power to ratify the "appointment, contract term, contract renewal, refusal to renew a contract, or removal of the district superintendent." (Ed. Code, § 35921, subd. (b).) The question thus presented is whether the effective grant of veto power over the selection of the District Superintendent to an entity that is not part of the public school system is an unconstitutional transfer of part of the public school system.[27] We are forced to conclude that it is. The cases construing article IX, section 6 are concerned

[26] The Mayor relies on Education Code section 52055.5, which allows the State Superintendent to take control over a school when it fails to show significant progress two years after receiving funds under the "Immediate Intervention/Underperforming Schools Program." (Ed. Code, § 52053 et seq.) That the state can intervene in certain specifically defined dire circumstances does not demonstrate any real supervision, management or control—particularly when there is no guarantee the "cluster" schools will even be part of the Immediate Intervention/Underperforming Schools Program.

[27] The Mayor argues by analogy. The Mayor contends that the Council of Mayors' ratification of the selection of the District Superintendent is akin to the United States Senate's power to confirm nominees to the executive and judicial branches. (U.S. Const., art. II, § 2.) The Mayor argues that since the United States Senate is not thereby granted "management and control" over the executive and judicial branches, the Romero Act does not grant the Council of Mayors management and control over the functions performed by the District Superintendent. The analogy effectively serves to clarify the issue. The United States Constitution is set up as a system of checks and balances, in which powers are spread among the three branches so that no one branch has unrestrained authority. In contrast, article IX of the California Constitution addresses no such separation of power concerns, but rather is the means by which the people of California have constitutionally vested *complete* authority over the public school system in the school districts and other agencies authorized to maintain it. The Mayor's argument simply begs the question as to whether the Legislature may grant to a nonmember of

with *ultimate* control being in the hands of the public school system. (See *Wilson v. State Bd. of Education, supra*, 75 Cal.App.4th at p. 1142 ["Charter schools are under the jurisdiction of chartering authorities; chartering authorities are authorities 'within the Public School System,' . . . hence no violation of article IX, section 6 can be stated"]; *California Teachers Assn. v. Board of Trustees, supra*, 82 Cal.App.3d at p. 255 [private driver training schools are permitted to teach public school students when the teaching is done under the control and supervision of the school district].) Here, *ultimate* control is with the Council of Mayors. While the Board can make the *initial* selection of the District Superintendent (or whether to fire, or retain an individual in that position), that act is for naught without the approval of the Council of Mayors. As such, control over the very crucial selection of the District Superintendent is out of the hands of the public school system. This is a violation of article IX, section 6 of the Constitution.[28]

### 4. *The Unconstitutional Provisions of the Romero Act Are Not Severable*

■ Having concluded that the great bulk of the Romero Act is unconstitutional, the issue becomes whether those provisions can be severed, allowing the remainder of the Romero Act to go into effect. For the unconstitutional portions of a law to be severable, they must be "grammatically, functionally, and volitionally separable" from the remainder of the law. (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247].) The dispute in this case is over the third factor. This determination focuses on whether the remainder of the statute would have been adopted by the Legislature had it foreseen the partial invalidity of the statute. (*Ibid.*)

In this case, we are guided by the legislative history. As the Romero Act proceeded through the Legislature, a severability clause was added by amendment on August 8, 2006. (Assem. Bill No. 1381 (2005–2006 Reg. Sess.) § 4, as amended Aug. 8, 2006.) On August 28, 2006, the Senate deleted the severability clause. (Assem. Bill No. 1381 (2005–2006 Reg. Sess.), as amended Aug. 28, 2006.) The Assembly Republican Bill Analysis regarding this version of the bill sets forth, at length, the political maneuvering that resulted in the deletion of the severability clause. It appears that the possible future invalidation of the Council of Mayors and Mayor's Partnership aspects of the Romero Act had been considered, given the Legislative Counsel's opinions. Certain proponents of the Romero Act were concerned that if those

---

the public school system veto power over the appointment of an important official in that system without running afoul of that constitutional mandate.

[28] For similar reasons, the provision of the Romero Act granting the Southeast Cities Schools Coalition the power to ratify the selection of the local district superintendent serving those cities also violates article IX, section 6 of the California Constitution.

provisions were, in fact, invalidated, " 'what was left would be a step backward.' " (Assem. Republican analysis of Assem. Bill No. 1381 (2005–2006 Reg. Sess.) as amended Aug. 28, 2006, p. 9.) They were concerned that provisions strengthening the District Superintendent and weakening the Board would not be desirable if the Council of Mayors did not have control over the appointment of the District Superintendent. They were also concerned that the concessions giving teachers added input in curriculum decisions " 'would strengthen employee unions at the expense of actual school reform.' " (*Id.* at p. 10.) Therefore, they successfully lobbied for the removal of the severability clause.[29]

 Since the severability clause was removed in light of concerns that some proponents of the bill did not, in fact, want the provisions of the Romero Act to be severable, we conclude that the Legislature *had* considered the possibility of partial invalidity of the Romero Act, and had concluded that it would not, in fact, want the remainder of the law to be effective.[30] We therefore conclude the provisions of the Romero Act are not severable.

## *CONCLUSION*

The citizens of Los Angeles have the constitutional right to decide whether their school board is to be appointed or elected. If the citizens of Los Angeles *choose* to amend their charter to allow the Mayor to appoint the members of the Board, such amendment would indisputably be proper. What is not permissible is for the Legislature to ignore that constitutional right and to bypass the will of the citizens of Los Angeles and effectively transfer many of the powers of the Board to the Mayor, based on its belief, hope, or assumption that he could do a better job. The trial court's order granting the writ prohibiting the enforcement of the Romero Act in its entirety must be affirmed.

---

[29] The legislative history also indicates the Legislature was aware that there was already a severability clause in the Education Code (Ed. Code, § 6). Some took the position that the deletion of the severability clause from the Romero Act would have no effect as the Education Code's severability clause still existed. In his reply brief on appeal, the Mayor suggests that the Legislature did not delete the severability clause until "after being assured by Legislative Counsel that such a clause was unnecessary in light of the general severability provision in Education Code section 6." This is untrue. The referenced Legislative Counsel's opinion is dated November 6, 2006—well after the severability clause had been deleted, the Romero Act had been enacted, and plaintiffs had already filed their petition for writ of mandate challenging the law. (Ops. Cal. Legis. Counsel, No. 0621957 (Nov. 6, 2006) Severability Clause: Education Code.)

[30] On appeal, the State defendants argue only that the Council of Mayors provision or the Mayor's Partnership provision should be considered severable if only one of the two is invalidated. They do not argue that the remainder of the Romero Act should go forward in the event, as we have concluded, that *both* provisions are unconstitutional.

## DISPOSITION

The judgment is affirmed. Plaintiffs shall recover their costs on appeal.

Klein, P. J., and Kitching, J., concurred.